## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF MICHIGAN; GRETCHEN | ) | Civil Action No. 1:25-cv-496 |
| WHITMER, in her official capacity as | ) | |
| Governor of Michigan; and DANA NESSEL, in her | ) | |
| official capacity as Michigan Attorney General, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

_____

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff United States of America bring this civil action against Defendants and alleges as follows:

### <u>INTRODUCTION</u>

1.    The United States is facing an energy crisis. Overly restrictive policies and regulation have caused inadequate development of America's abundant energy resources. Yet "[a]n affordable and reliable domestic energy supply is essential to the national and economic security of the United States, as well as our foreign policy." Executive Order 14260, *Protecting American Energy From State Overreach* § 1.

2.    As a result, on January 20, 2025, President Trump declared an energy emergency, concluding that the United States' "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." Executive Order 14156 § 1, *Declaring a National Energy Emergency*.

3.      As a result of state restrictions and burdens on energy production, the American people are paying more for energy, and the United States is less able to defend itself from hostile foreign actors. *Id*.

4.      Michigan intends to sue fossil fuel companies to seek damages for alleged climate change harms. *See* Scott McClallen, *Michigan To Wage War on Oil and Gas Companies*, Michigan Capitol Confidential (Oct. 14, 2024), https://www.michigancapitolconfidential.com/news/michigan-to-wage-war-on-oil-and-gas-companies. At a time when States should be contributing to a national effort to secure reliable sources of domestic energy, Michigan is choosing to stand in the way. This Nation's Constitution and laws do not tolerate this interference.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

6.      This Court has authority to provide the relief requested under the U.S. Constitution, 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent legal and equitable powers.

7.      The United States has standing to vindicate its sovereign, proprietary, and parens patriae interests. *E.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). The United States' sovereign interests include ensuring that States do not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy. The United States' proprietary interests include its economic interests in revenue from fossil fuel leasing on federal lands, which generated over $13.8 billion in 2024,[1] and its costs for purchasing fossil fuels, which will

---

[1] The Department of the Interior manages land owned by the United States. The Department issues leases to produce fossil fuels from federal lands and for production in areas of the Outer

increase if Michigan and other states seek damages from fossil fuel companies. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 103 (2d Cir. 2021) (observing that holding fossil fuel producers "accountable for purely foreign activity (especially the Foreign Producers) would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad."). Additionally, the United States has parens patriae standing to protect the economic well-being of its citizens and the national energy market from Michigan's attempts to impose extraterritorial and excessive burdens on fossil fuel companies, which will raise energy costs for consumers nationwide and disrupt the uniform regulation of fossil fuel production. These harms affect a substantial segment of the population, and individual litigants, such as fossil fuel businesses, cannot fully address the nationwide economic and constitutional injuries caused by Michigan's overreach.

8.      This Court has personal jurisdiction over Defendants because they reside in, or conduct a substantial portion of their official business in, Michigan. *See* Fed. R. Civ. P. 4(k)(1).

9.      Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, because at least one Defendant resides in the District and because a substantial part of the acts giving rise to this suit occurred within the District.

## PARTIES

10.      Plaintiff is the United States of America, suing on its own behalf, on behalf of its citizens, and on behalf of its executive departments and other subdivisions.

11.      Defendant State of Michigan is a State of the United States.

---

Continental Shelf. Each year, the Department collects substantial revenue from those onshore and offshore leases. In 2024, the Department collected revenue of more than $490 million for coal, $950 million for gas, and $12.4 billion for oil. U.S. DEP'T OF THE INTERIOR, NATURAL RESOURCES REVENUE DATA, https://revenuedata.doi.gov/ (last visited Apr. 30, 2025).

12.    Defendant Gretchen Whitmer is the Governor of the State of Michigan. She is sued in her official capacity.

13.    Defendant Dana Nessel is the Attorney General of the State of Michigan. She is sued in her official capacity.

## ALLEGATIONS AND APPLICABLE LAW

### Michigan's Climate Change Claims

14.    Michigan has announced its intent to file litigation seeking to hold fossil fuel companies liable for purported contributions to greenhouse gas emissions. *See* Scott McClallen, *Michigan To Wage War on Oil and Gas Companies*, Michigan Capitol Confidential (Oct. 14, 2024), https://www.michigancapitolconfidential.com/news/michigan-to-wage-war-on-oil-and-gas-companies. The specific theories on which Michigan would sue are known only to Michigan, but the goal of the lawsuit is clear—to extract large sums of money from fossil fuel companies for purportedly causing climate change impacts to Michigan. *See id.*

### The Clean Air Act Comprehensively Regulates Nationwide Air Pollution

15.    The Clean Air Act, 42 U.S.C. § 7401 et seq., creates a comprehensive program for regulating air pollution in the United States and "displaces" the ability of States to regulate greenhouse gas emissions beyond their borders. *City of New York*, 993 F.3d at 96. The Act improves the Nation's air quality by delegating authority to EPA to prescribe national standards for air pollutants, which States then implement. *See, e.g.*, 42 U.S.C. § 7411.

16.    In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court concluded that greenhouse gases, such as carbon dioxide and methane, are within the Clean Air Act's unambiguous definition of "air pollutant," 42 U.S.C. § 7602(g). *Id*. at 528-529. Thus, the Clean

4

Air Act delegates to EPA authority to set nationwide standards for greenhouse gases. *See Am. Electric Power Co., Inc. v. Connecticut* (*AEP*), 564 U.S. 410, 424-429 (2011).

17.     For in-state stationary sources, the Clean Air Act generally preserves the ability of States to adopt and enforce air pollution control requirements and limitations on in-state sources, so long as those are at least as stringent as the corresponding federal requirements. *See* 42 U.S.C. § 7416. For out-of-state sources, however, the "Act gives states a much more limited role," even if the pollution from those sources causes harm within their borders. *City of New York*, 993 F.3d at 88. Affected States can: (1) comment on proposed EPA rules and certain permits and plans, *see id.* § 7607(d)(5), § 7475(a)(2), § 7410(a)(2)(C); 40 C.F.R. § 51.102(a); (2) seek judicial review if their concerns are not addressed, *see* 42 U.S.C. § 7607(b); and (3) petition EPA in certain instances, *see id.* § 7410(k)(5).

### The United States' Foreign Policy on Greenhouse Gas Regulation and Energy Development

18.     Greenhouse gas emissions "present[] a uniquely international problem of national concern." *City of New York*, 993 F.3d at 85. Regulating these emissions "implicates" not only "the conflicting rights of states" but also "our relations with foreign nations." *Id.* at 92.

19.     Consistent with the Constitution's allocation of supremacy in the field of foreign policy to the federal government, *see Hines v. Davidowitz*, 312 U.S. 52, 62 (1941), the federal government has demonstrated an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security when regulating greenhouse gas emissions and fossil fuels, *see City of New York*, 993 F.3d at 93 (recognizing responsibility of federal government in striking the right "balance" in promoting these goals). The federal government has been actively exercising its authority here and has been continually evaluating national interests as is its responsibility under the Constitution. It has "in

fact . . . addressed" these interwoven issues on many occasions. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003).

20.     In 1987, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. Among its other goals, the Protection Act provided that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions. *Id*. § 1103(a)(4), 101 Stat. at 1408. It assigned to the President and EPA the responsibility for devising a "coordinated national policy on global climate change." *Id*. § 1103(b), 101 Stat. at 1408. And the Protection Act assigned to the President and the Secretary of State the responsibility for coordination of climate change policy "in the international arena." *Id*. § 1103(c), 101 Stat. at 1409.

21.     In 1992, President George H. W. Bush signed, and the Senate unanimously approved, the United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into force Mar. 21, 1994), which has as its "ultimate objective . . . stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id*., Art. 2.

22.     Under the Framework Convention, "[a]ll Parties," including the United States, "shall . . . .  (b) [f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate climate change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases not controlled by the Montreal Protocol, and measures to facilitate adequate adaptation to climate change [and] (c) [p]romote and cooperate in the development, application and diffusion, including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of

greenhouse gases not controlled by the Montreal Protocol in all relevant sectors . . . ." *Id*., Art. 4.1(b), (c).

23.     The Framework Convention does not set binding limits on greenhouse gas emissions for individual countries. It contains no enforcement mechanism. Instead, it includes general obligations addressing climate change and creates a framework for cooperation by its parties. Among other things, it contemplates the possibility of its parties negotiating "protocols" or other specific international agreements in pursuit of its objective.

24.     Since approving the Framework Convention, the United States has engaged in international efforts regarding climate change and greenhouse gas emissions, balancing foreign policy considerations and domestic energy needs. In particular, the United States is also a party to the Kigali Amendment to the Montreal Protocol. *See* Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, Oct. 15, 2016, S. Treaty Doc. No. 117-1, C.N.730.2017. The Amendment commits the United States and other signatory countries to phase down the production and consumption of hydrofluorocarbons, a greenhouse gas. The Senate ratified the Kigali Amendment in 2022, but only after Congress enacted the American Innovation and Manufacturing Act, 42 U.S.C. § 7675 in 2020, giving EPA authority under the Clean Air Act to reduce production and consumption of hydrofluorocarbons.

25.     By contrast, the United States is *not* a party to the Kyoto Protocol of 1997, which provided for greenhouse gas emission reduction targets on UNFCCC Annex I parties, including the United States. Though the United States signed the protocol, President Clinton never submitted it to the Senate for ratification. Instead, the Senate passed a unanimous resolution expressing disapproval of any protocol or other agreement that provides for disparate treatment of economically developing countries. S. Res. 98, 105th Cong. (1997).

26.     The United States is similarly not a party to the December 12, 2015 Paris Climate

Accord (the Paris Agreement). Paris Agreement to the United Nations Framework Convention

on Climate Change, Dec. 13, 2015, in Rep. of the Conference of the Parties on the Twenty-First

Session, U.N. Doc. FCCC/CP/2015/10/Add.1, annex (2016). In September 2016, President

Obama signed the Paris Agreement but did not submit it to the Senate for ratification. On March

28, 2017, President Trump described how the United States would seek to reconcile the Nation's

environmental, economic, and strategic concerns. *See* Exec. Order 13,783, 82 Fed. Reg. 16,093

(Mar. 28, 2017). On November 4, 2019, the United States deposited a notification of withdrawal

from the Paris Agreement. Although on February 19, 2021, President Biden announced that he

rejoined this expensive and destructive protocol, on February 13, 2025, President Trump

withdrew the United States from the Paris Agreement. *See* Executive Order 14162, *Putting*

*America First in International Agreements* § 3(a). The President explained that "[i]t is the policy

of my Administration to put the interests of the United States and the American people first in

the development and negotiation of any international agreements with the potential to damage or

stifle the American economy" and that such agreements "must not unduly or unfairly burden the

United States." *Id*. § 2. In other words, the President would put the interests of the American

people first in negotiating the terms of any future treaty to implement the Framework Convention

27.     More recently, on April 2, 2025, President Trump invoked his authority under the

International Emergency Economic Powers Act of 1977 to strengthen our Nation's international

economic position by imposing reciprocal tariffs on U.S. trading partners. *See* Executive Order

14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute*

*to Large and Persistent Annual United States Goods Trade Deficits*. The Executive Order

specifically exempts "energy and energy products" from the tariffs. *Id*. § 3(b); *see also* Annex II.

## CLAIMS FOR RELIEF

### COUNT I
### Clean Air Act Preemption

28.    The United States incorporates by reference all allegations stated above.

29.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

30.    A state law is preempted under the Supremacy Clause when it intrudes into a field exclusively occupied by federal law (field preemption) or when it conflicts with federal law by standing as an obstacle to the accomplishment of Congress's objectives (conflict preemption). *See City of Milwaukee v. Illinois*, 451 U.S. 304, 316-17 (1981) (field preemption); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985) (conflict preemption).

31.    Michigan's state law claims are preempted by the Clean Air Act, 42 U.S.C. §§ 7401 et seq., because they impermissibly regulate out-of-state greenhouse gas emissions and obstruct the Clean Air Act's comprehensive federal-state framework and EPA's regulatory discretion, *see, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987) ("The [Clean Water] Act pre-empts state law to the extent that the state law is applied to an out-of-state point source."); *Arizona*, 567 U.S. at 399-400 (discussing preemption).

32.    "The Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions." *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428).

33.    Congress delegated to EPA the authority to determine whether and how to regulate greenhouse gas emissions, thereby displacing federal common law claims and

occupying the field of interstate air pollution regulation. *See Massachusetts*, 549 U.S. at 528-29

(holding that greenhouse gases are "air pollutants" under 42 U.S.C. § 7602(g)); *AEP*, 564 U.S. at

426 ("The critical point is that Congress delegated to EPA the decision whether and how to

regulate carbon-dioxide emissions . . . the delegation displaces federal common law."); *City of

Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (holding that the Federal Water Pollution

Control Act's comprehensive regulatory program displaced federal common law of nuisance, as

Congress occupied the field of water pollution regulation).

    34.    The Clean Air Act's comprehensive framework, which includes specific

provisions for regulating emissions from stationary and mobile sources (*see, e.g.*, 42 U.S.C.

§§ 7410, 7411, 7521), preempts state attempts to regulate out-of-state greenhouse gas emissions.

*See City of New York*, 993 F.3d at 90-100. Michigan's claims seeking to hold fossil fuel

businesses liable for global greenhouse gas emissions usurp this federal authority. Michigan's

attempt to make fossil fuel companies pay for greenhouse gas emissions worldwide, most of

which occur outside Michigan's borders, is the type of state regulation of out-of-state interstate

greenhouse gas emissions preempted by the Clean Air Act. *See* Scott McClallen, *Michigan To

Wage War on Oil and Gas Companies*, Michigan Capitol Confidential (Oct. 14, 2024),

https://www.michigancapitolconfidential.com/news/michigan-to-wage-war-on-oil-and-gas-

companies.

    35.    Michigan's state law claims conflict with the Clean Air Act's purposes and

objectives by undermining its carefully calibrated cooperative federalism scheme and EPA's

discretion in regulating greenhouse gas emissions.

    36.    The Clean Air Act establishes a structured partnership between the federal

government and States, allowing States to regulate in-state stationary sources under specific

conditions, *see, e.g.*, 42 U.S.C. §§ 7401(a)(3), 7410(a)(2)(C), 7411(d), 7416, but limiting their

role in regulating out-of-state or global emissions, see, e.g., 42 U.S.C. §§ 7410(a)(2)(C),

7410(k)(5), 7475(a)(2), 7607(b). And the Clean Air Act contains a citizen-suit savings clause. 42

U.S.C. § 7604(e). When read together, the Clean Air Act "plainly permit[s] [S]tates to create and

enforce their own emissions standards applicable to in-state polluters." *City of New York*, 993

F.3d at 99. This role "no doubt holds true for both state legislation and common law claims

under state law." *Id.* at 100 (citing *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690-

91 (6th Cir. 2015)). "But that authorization is narrowly circumscribed, and has been interpreted

to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.*

(citations omitted).

37.     Michigan's anticipated lawsuit "does not seek to take advantage of this slim

reservoir of state common law." *City of New York*, 993 F.3d at 99. Rather, the State's suit

interferes with the Clean Air Act's balance by effectively regulating out-of-state emissions. This

extraterritorial regulation creates a patchwork of state-level penalties that undermines state

authority over pollution sources within state borders and frustrates the Clean Air Act's goal of

efficiency and predictability in the permit system. *See Ouellette*, 479 U.S. at 496; *see also AEP*,

564 U.S. at 426 (holding that the Clean Air Act's delegation to the EPA to regulate greenhouse

gas emissions displaces federal common law, reflecting federal primacy). Such state

encroachment on federal authority is preempted, as it obstructs the Clean Air Act's integrated

approach to air pollution control. *See Ouellette*, 479 U.S. at 497; *see also City of New York*, 993

F.3d at 90-95.

38.     Moreover, Michigan's anticipated lawsuit obstructs EPA's discretion to balance

environmental, economic, and energy considerations in regulating greenhouse gases. The Clean

Air Act grants EPA broad authority to promulgate regulations based on its expert judgment, including whether to impose emissions standards for stationary sources under 42 U.S.C. § 7411 and for mobile sources under 42 U.S.C. § 7521. By imposing retroactive liability for lawful conduct, Michigan would second-guess EPA's regulatory choices and imposes penalties that Congress did not authorize.

39.    Michigan's state law claims would further undermine federal objectives by increasing energy costs and disrupting the national energy market, contrary to the Clean Air Act's integration with national energy policy. As noted in Executive Order 14156 (¶ 2), insufficient energy production due to restrictive state policies threatens national security and economic prosperity. By targeting major fossil fuel businesses, many of which operate on federal lands or supply federal agencies, Michigan's anticipated lawsuit would raise costs for federal operations and consumers nationwide, obstructing the Clean Air Act's goal of balancing environmental protection with economic growth. *See* 42 U.S.C. § 7401(b)(1) (CAA's purpose includes protecting air quality "to promote the public health and welfare and the productive capacity of its population").

40.    If Michigan is permitted to pursue these sorts of state law claims, other States could pursue similar claims, leading to a chaotic "patchwork" of regulations that undermine the national interest in readily available and affordable energy and the government's ability to effectively administer coherent national environmental policy and regulation of global pollution. *City of New York*, 993 F.3d at 86. Such fragmentation would frustrate Congress's intent for a unified federal approach to global air pollution. *See Hines*, 312 U.S. at 67 (state law preempted when it obstructs federal objectives).

41.    Thus, Michigan's state law claims are preempted by the Clean Air Act.

12

## COUNT II
### Unconstitutional Extraterritorial Regulation

42.    The United States incorporates by reference all allegations stated above.

43.    The Constitution's structure and provisions, including the Due Process Clause, as well as concepts of State sovereignty and federalism, prohibit a State from regulating transactions, and imposing liability for conduct, occurring outside its borders. Michigan's state law claims violate the Constitution by imposing extraterritorial liability for primarily out-of-state extraction and refining activities and out-of-state greenhouse gas emissions. Michigan's anticipated lawsuit is irreconcilable with the Constitution's commitment of such matters to the federal government and the relative rights and obligations of the federal government and the States under the Constitution.

44.    The United States has standing to assert this claim to protect its sovereign, proprietary, and parens patriae interests. Michigan's anticipated lawsuit, which would seek extraterritorial liability, interferes with the federal government's authority to regulate interstate and foreign commerce and greenhouse gas emissions, undermining national energy policy. The financial burdens of Michigan's anticipated lawsuit on fossil fuel businesses increase the United States' costs for purchasing fuels and threaten revenue from federal leasing. In its parens patriae capacity, the United States seeks to protect citizens nationwide from higher energy costs and economic disruption caused by Michigan's anticipated overreach, which individual litigants cannot fully address due to the nationwide impact of Michigan's state law claims.

45.    The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. The fossil fuel businesses targeted by Michigan's state law claims are persons under the Fourteenth Amendment.

13

46.    The Constitution's structure and principles of due process mandate that while States are sovereign within their borders, they cannot regulate conduct beyond their borders, such as by imposing liability for pollution from out-of-state sources. "The concept of Due Process constraints on a state legislature's ability to regulate subject matters and transactions beyond the state's boundaries, while perhaps infrequently litigated in those terms, is not new." *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236-37 (11th Cir. 2001) (discussing Due Process limits on legislative jurisdiction). Indeed, "[t]o resolve disputes about the reach of one State's power," the Supreme Court "has long consulted … the Constitution's structure and the principles of 'sovereignty and comity' it embraces," along with "the Due Process Clause." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (citation omitted).

47.    It is a well-established "due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries." *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (citing *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930)). "The sovereignty of each State, in turn, implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

48.    Indeed, the Due Process Clause embodies "more than a guarantee of immunity from inconvenient or distant litigation" but also imposes "territorial limitations on the power of the respective States." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)) (discussing how the sovereignty of each state imposes limitations on sovereignty of other states).

14

49.    No single State can enact policies for the entire Nation, nor can a State "even impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 570-71 (1996). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id*. at 572. "The states are not nations, either as between themselves or towards foreign nations," and "their sovereignty stops short of nationality." *New Hampshire v. Louisiana*, 108 U.S. 76, 90 (1883). And "interstate . . . pollution is a matter of federal, not state, law." *Ouellette*, 479 U.S. at 488.

50.    Michigan's state law claims violate the Constitution's structure and principles of due process by seeking to impose economic sanctions on fossil fuel businesses for economic activities that occurred primarily in other States and around the world.

51.    Michigan's anticipated lawsuit would improperly seek to "impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)," *City of New York*, 993 F.3d at 93, including activities in other States and in foreign countries with no connection to Michigan. "Such a sprawling" scope "is simply beyond the limits of state law." *Id.* at 92.

52.    Even if an entity has some contacts with Michigan, such as in-state sales or operations, Michigan's effort to collect damages for out-of-state greenhouse gas emissions does not arise from or relate to those contacts, violating the requirement that a State's regulatory authority be limited to conduct with a substantial nexus to the State.

53.    Moreover, the global scope of Michigan's state law claims inherently overreaches by seeking to regulate conduct far beyond Michigan's territorial jurisdiction, contravening the Due Process Clause's territorial limitations on state sovereignty.

54.     Thus, Michigan's state law claims violate the Constitution's limits on extraterritorial legislation.

## COUNT III
## Violation of the Interstate Commerce Clause

55.     The United States incorporates by reference all allegations stated above.

56.     The Constitution gives Congress "Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

57.     State laws that discriminate against interstate commerce are unconstitutional, even in the absence of federal legislation regulating the activity in question. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

58.     Michigan's state law claims discriminate against interstate commerce facially, in practical effect, and in purpose by targeting commercial activity—fossil fuel extraction and refining—that occurs primarily if not exclusively in States other than Michigan, including Texas, New Mexico, Louisiana, West Virginia, Pennsylvania, Oklahoma, and North Dakota.

59.     Because Michigan's state law claims discriminate against interstate commerce, strict scrutiny applies, and its anticipated lawsuit can be pursued only if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988).

60.     Upon information and belief, Michigan has no legitimate local public interest in discriminating against interstate commerce.

61.     Moreover, even if Michigan's state law claims did not facially discriminate against interstate commerce and did not have non-discriminatory alternatives, it would still violate the Interstate Commerce Clause under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under *Pike*, a state law that regulates evenhandedly and

16

has only incidental effects on interstate commerce is unconstitutional if the burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Id*.

62.     Michigan's anticipated lawsuit would also impose substantial burdens on interstate commerce. By targeting fossil fuel businesses for extraction and refining activities and greenhouse gas emissions occurring primarily in other States and foreign countries, Michigan would disrupt the national market for fossil fuels. Michigan's request for damages would increase energy costs for consumers and businesses nationwide, as these costs are passed through the interstate energy market. The potential for other States to adopt similar laws creates a risk of regulatory fragmentation, undermining the uniform national energy market.

63.     Michigan's state law claims would impose a substantial and undue burden on interstate commerce that is clearly excessive in relation to any putative local benefits.

64.     Thus, Michigan's anticipated lawsuit would violate the Interstate Commerce Clause.

## COUNT IV
## Violation of the Foreign Commerce Clause

65.     The United States incorporates by reference all allegations stated above.

66.     The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

67.     The Constitution gives Congress the "Power . . . [t]o regulate Commerce with foreign Nations . . . ."  U.S. Const. art. I, § 8, cl. 3.

17

68.    The Foreign Commerce Clause has a negative application. Thus, for example, State laws that impose taxes on foreign commerce "will not survive Commerce Clause scrutiny if the taxpayer demonstrates that the tax" implicates one of the four concerns identified in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). A State law imposing taxes is unconstitutional if it (1) applies to an activity lacking a substantial nexus to the State; (2) is not fairly apportioned; (3) discriminates against interstate commerce; *or* (4) is not fairly related to the services provided by the State. *See Barclays Bank PLC v. Franchise Tax Bd. Of California*, 512 U.S. 298, 310-11 (1994) (citing *Complete Auto*, 430 U.S. at 279). "In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Id*. at 311 (cleaned up). Thus, "[a] tax affecting *foreign* commerce therefore raises two concerns in addition to the four delineated in *Complete Auto*." *Id*. "The first is prompted by the enhanced risk of multiple taxation. The second relates to the Federal Government's capacity to speak with one voice when regulating commercial relations with foreign governments." *Id*. (cleaned up).

69.    Michigan's anticipated lawsuit is not a state tax. But the same limiting principles that apply to a State's power to impose taxes on foreign commerce also apply to a State's power to impose penalties, fines, and other civil liability on foreign commerce.

70.    Michigan's state law claims discriminate against foreign commerce facially, in practical effect, and in purpose by imposing penalties or fines that directly and substantially burden foreign commerce. Michigan would seek to impose liability on fossil fuel businesses for activities—extraction and refining of fossil fuels—that occurred "worldwide" in foreign countries. Michigan would seek to impose liability on these foreign activities even though they lack a substantial nexus to Michigan. Michigan also would discriminate against foreign

18

commerce and imposes liability that is not fairly related to the services provided by the State. Michigan's anticipated lawsuit would enhance the risk of multiple States imposing overlapping liability on foreign commerce for the same activities. And it would harm the federal government's capacity to speak with one voice when conducting commercial relations with foreign governments on issues such as regulation of greenhouse gas emissions, trade policy, exports and imports of fossil fuels, and national security.

71.    The United States does not challenge Michigan's authority to regulate the local activities of international corporations, such as emissions from in-state facilities or taxes on in-state sales. Ordinary state regulations that incidentally affect foreign commerce without such extraterritorial scope or federal interference remain permissible under the Foreign Commerce Clause. But Michigan's anticipated lawsuit does not fall within this permissible role for States. Rather, Michigan's attempt to expropriate funds from worldwide extraction and refining with minimal nexus to Michigan, imposes a disproportionate burden on foreign commerce, and undermine the federal government's ability to maintain uniformity in regulating environmental, trade, and national security policy.

72.    Thus, Michigan's state law claims violate the Foreign Commerce Clause.

## COUNT V
## Foreign Affairs Preemption

73.    The United States incorporates by reference all allegations stated above.

74.    The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

75.    Even aside from his military powers as the "Commander in Chief of the Army and Navy," U.S. Const. art. II, § 2, cl. 1, the Constitutions vests broad responsibility for the conduct of foreign affairs in the President of the United States.

76.    The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id*., art. II, § 2, cl. 2.

77.    The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id*.

78.    The President "receive[s] Ambassadors and other public Ministers." *Id*., art. II, § 3.

79.    The Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id*.

80.    In short, "the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution." *Hines*, 312 U.S. at 62.

81.    The Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the States that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise has more than an incidental effect in conflict with express foreign policy. *See Garamendi*, 539 U.S. at 418-20.

82.    Michigan's state law claims fall outside the area of any traditional state interest. They instead regulate "a uniquely international problem" that is "not well-suited to the application of state law." *City of New York*, 993 F.3d at 85-86.

83.    By adopting the Framework Convention, the federal government undertook to formulate foreign policy with respect to the "stabilization of greenhouse gas concentrations in

the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." Framework Convention, Art. 2.

84.    By attempting to impose liability based on greenhouse gas emissions purportedly attributable to worldwide fossil fuel extraction and refining, Michigan's anticipated lawsuit could undermine the ability of the United States to speak with one voice on a matter of pressing interest around the globe. Michigan's state law claims also could complicate the United States' relations with foreign countries concerning regulation of greenhouse gas emissions, trade policy, and exports and imports of fossil fuels. And Michigan's state law claims penalize extraction and refining activities in foreign countries despite the President's explicit judgment that energy imports should be exempt from the tariffs imposed under Executive Order 14257.

85.    Michigan's anticipated lawsuit interferes with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement, and is therefore preempted.

86.    This claim does not challenge Michigan's authority to enact local regulations that incidentally affect international corporations, such as environmental standards for in-state operations. Instead, the United States seeks to prevent Michigan from pursuing its state law claims because its imposition of liability for worldwide greenhouse gas emissions directly intrudes on the federal government's exclusive authority over foreign affairs, including the United Nations Framework Convention on Climate Change and trade policy. This extraordinary extraterritorial reach and conflict with federal foreign policy distinguish Michigan's state law claims from ordinary state regulations that do not undermine the United States' ability to speak with one voice in international relations.

87.    Simply put, Michigan's attempt "to recover damages for the harms caused by global greenhouse gas emissions may" not "proceed under [Michigan] law." *City of New York*, 993 F.3d at 91.

88.    Thus, Michigan's state law claims are preempted by the foreign affairs doctrine.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.    Declare Michigan's state law claims unconstitutional under 28 U.S.C. § 2201;

B.    Permanently enjoin Defendants from taking actions to assert Michigan's state law claims;

C.    Award the United States its costs and disbursements in this action; and

D.    Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

s/ Justin D. Heminger
JUSTIN D. HEMINGER
Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
Telephone: (202) 514-5442
Facsimile: (202) 305-0506
Email: justin.heminger@usdoj.gov