## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF MICHIGAN; GRETCHEN | ) | Civil Action No. 1:25-cv-496-JMD-SJB |
| WHITMER, in her official capacity as | ) | |
| Governor of Michigan; and DANA NESSEL, in her | ) | |
| official capacity as Michigan Attorney General, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

_____

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff United States of America bring this civil action against Defendants and alleges as follows:

### **INTRODUCTION**

1.     The United States is facing an energy crisis. Overly restrictive policies and regulation have caused inadequate development of America's abundant energy resources. Yet "[a]n affordable and reliable domestic energy supply is essential to the national and economic security of the United States, as well as our foreign policy." Executive Order 14260, *Protecting American Energy From State Overreach* § 1.

2.     On January 20, 2025, President Trump declared an energy emergency, concluding that the United States' "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." Executive Order 14156 § 1, *Declaring a National Energy Emergency*.

3.      As a result of state restrictions and burdens on energy production, the American people are paying more for energy, and the United States is less able to defend itself from hostile foreign actors. *Id*.

4.      Not satisfied with its legitimate regulatory options, Michigan intends to sue fossil fuel companies to seek damages for alleged climate change harms. *See infra* ¶¶ 14–28. At a time when States should be contributing to a national effort to secure reliable sources of domestic energy for its residents, Michigan is choosing to stand in the way. This Nation's Constitution and laws do not tolerate this interference.

<u>**JURISDICTION AND VENUE**</u>

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

6.      This Court has authority to provide the relief requested under the U.S. Constitution, 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent legal and equitable powers.

7.      The United States has standing to vindicate its sovereign, proprietary, and parens patriae interests. *E.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). The United States' sovereign interests include ensuring that States do not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy. The United States' proprietary interests include its economic interests in revenue from fossil fuel leasing on federal lands, which generated over $13.8 billion in 2024,[1] and its costs for purchasing fossil fuels, which will

---

[1] The Department of the Interior manages land owned by the United States. The Department issues leases to produce fossil fuels from federal lands and for production in areas of the Outer Continental Shelf. Each year, the Department collects substantial revenue from those onshore and offshore leases. In 2024, the Department collected revenue of more than $490 million for coal, $950 million for gas, and $12.4 billion for oil. U.S. DEP'T OF THE INTERIOR, NATURAL RESOURCES REVENUE DATA, https://revenuedata.doi.gov/ (last visited Apr. 30, 2025).

increase if Michigan and other states seek damages from fossil fuel companies. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 103 (2d Cir. 2021) (observing that holding fossil fuel producers "accountable for purely foreign activity (especially the Foreign Producers) would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad."). Additionally, the United States has parens patriae standing to protect the economic well-being of its citizens and the national energy market from Michigan's planned efforts to impose extraterritorial and excessive burdens on fossil fuel companies, which will raise energy costs for consumers nationwide and disrupt the uniform regulation of fossil fuel production. These harms affect a substantial segment of the population, and individual litigants, such as fossil fuel businesses, cannot fully address the nationwide economic and constitutional injuries caused by Michigan's overreach.

8.     This Court has personal jurisdiction over Defendants because they reside in, or conduct a substantial portion of their official business in, Michigan. *See* Fed. R. Civ. P. 4(k)(1).

9.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, because at least one Defendant resides in the District and because a substantial part of the acts giving rise to this suit occurred within the District.

## PARTIES

10.     Plaintiff is the United States of America, suing on its own behalf, on behalf of its citizens, and on behalf of its executive departments and other subdivisions.

11.     Defendant State of Michigan is a State of the United States.

12.     Defendant Gretchen Whitmer is the Governor of the State of Michigan. She is sued in her official capacity.

13.     Defendant Dana Nessel is the Attorney General of the State of Michigan. She is sued in her official capacity.

## ALLEGATIONS AND APPLICABLE LAW

### Michigan's Threatened and Forthcoming Climate Change Claims

14.     Michigan plans to file litigation seeking to hold fossil fuel companies liable for purported contributions to greenhouse gas emissions, as its Attorney General has made clear both by word and deed. Michigan has even entered a contract with three law firms to file that litigation and appointed attorneys at those firms to be Special Assistant Attorneys General to litigate the case.

15.     On or about May 9, 2024, Defendant Nessel (Michigan's Attorney General) issued a request for proposals from private attorneys and law firms "to pursue litigation related to the climate change impacts caused by the fossil fuel industry on behalf of the State of Michigan." Ex. 1, *AG Nessel Requests Proposals from Attorneys to Pursue Litigation Against Fossil Fuel Industry for Climate Impact*, Mich. Dep't of Att'y Gen. (May 9, 2024), https://perma.cc/G6XU-CK58.

16.     In issuing the request for proposals, Defendant Nessel said, "Our 'Pure Michigan' identity is under threat from the effects of climate change . . . . Pursuing this litigation [against the fossil fuel industry] will allow us to recoup our costs and hold those responsible for jeopardizing Michigan's economic future and way of life accountable." *Id.*

17.     Specifically, the request for proposals solicited "proposals from attorneys and law firms to serve as Special Assistant Attorneys General (SAAGs) to pursue litigation related to the climate change impacts caused by the fossil fuel industry on behalf of the State of Michigan

through the Department of Attorney General." Ex. 2, *Climate Change*, Mich. Dep't of Att'y
Gen., https://perma.cc/K3QL-Y59J.

18.    The request for proposals' Statement of Work confirmed that Defendant Nessel
sought "to pursue constitutional, statutory, tort and other applicable common-law claims
extending to the deception and other wrongful actions by the fossil fuel industry to require the
parties who profited from hiding the consequences of fossil fuel use to bear the costs of climate
change on Michigan." Ex. 3, *Statement of Work (SOW)*, Mich. Dep't of Att'y Gen.,
https://perma.cc/45R5-NSXX. It further asserted, "The fossil fuel industry has known for
decades that the use of fossil fuel products creates greenhouse gas pollution that warms the
planet and leads to climate change." *Id.*

19.    The Statement of Work made clear Defendant Nessel's intent to bring a lawsuit
against fossil fuel companies: "The work to be performed consists of assisting the [Department
of Attorney General] in gathering needed information, determining what claims will be brought,
drafting the complaints (as appropriate), conducting affirmative and defensive discovery, taking
and defending depositions, motion practice, and preparing for and conducting any trials that may
proceed." *Id.*

20.    On September 26, 2024, Defendant Nessel signed a contract to accomplish her
plans to sue fossil fuel companies (the Litigation Contract). Ex. 4, *SAAG Contract, State of
Michigan Department of Attorney General, Climate Change Litigation*, https://perma.cc/V5FX-
BKEU. In the Contract, Defendant Nessel selected three law firms, DiCello Levitt LLP, Sher
Edling LLP, and Hausfeld LLP, to provide legal services for "Climate Change litigation." *Id.*
And Defendant Nessel appointed attorneys at those firms to be "Special Assistant Attorneys
General" to pursue that litigation. *Id.*

5

21.     That same day, Defendant Nessel also signed a contingent fee agreement with the same three law firms, which was attached to the Litigation Contract. Ex. 5, *Fee Agreement, State of Michigan Department of Attorney General, Climate Change Litigation*, https://perma.cc/XS9J-BYLB. The fee agreement specifies what percentage of the recoveries the three law firms would recover from the Climate Change litigation they agreed to pursue for Michigan.

22.     Though Michigan has not yet filed its Climate Change litigation, it is no mystery what claims it is likely to assert. One of the law firms that Michigan has hired, Sher Edling, is a repeat player that has repeatedly sued fossil fuel companies. On its website, Sher Edling lists many cases that it has brought against fossil fuel companies, including lawsuits on behalf of seven states. *See* Sher Edling LLP, *Climate Damage and Deception*, https://perma.cc/MA84-TNVZ. Those complaints, which are available on the firm's website, assert claims under the plaintiff state's statutes or common law. But state-law claims by a state seeking to hold fossil fuel companies liable for out-of-state emissions or conduct are preempted by federal law and are otherwise unconstitutional for all the reasons set forth in this Complaint.

23.     Even after the filing of this case by the United States, Defendant Nessel confirmed that she will not be deterred from bringing her contemplated state-law claims against fossil fuel companies, saying, "The DOJ's baseless lawsuit is a blatant attempt to intimidate my office and deter us from holding Big Oil accountable." Ex. 6, *AG Nessel Moves to Dismiss DOJ Lawsuit Aimed at Blocking Potential Climate Action Against Fossil Fuel Industry*, Mich. Dep't of Att'y Gen. (June 20, 2025), https://perma.cc/CAM4-ZTZC.

24.    The imminent threat of Defendant Nessel following through on unconstitutional litigation is neither new nor speculative—she has a history of taking litigating positions against groups she openly disfavors.

25.    During her 2018 campaign, she disparagingly described those holding traditional religious views on marriage and sexuality "as 'hate-mongers'" motivated by "discriminatory animus." *Buck v. Gorden*, 429 F. Supp. 3d 447, 467 (W.D. Mich. 2019). Sure enough, once Defendant Nessel assumed office as Michigan's Attorney General, she made good on her action against those of opposing worldviews. In pending litigation against a religious-adoption agency, Defendant Nessel changed the State's position and opposed the agency's religious free-exercise in making child-placement decisions according to the agency's religious beliefs—despite a Michigan statute specifically protecting such decisions. *See id.* at 457-58, 467. Defendant Nessel sought dismissal of a later religious-discrimination suit against her, saying that she was not a proper defendant because "she is simply the State's chief legal counsel [and] is not responsible for Michigan's change in policy." *Id.* at 467. The court found her assertion untenable, describing her as "a pivotal player in the State's total reversal of position" in discrimination suits against religious-adoption agencies and finding "a strong inference that [the plaintiff] was targeted based on its religious belief, and that it was Defendant Nessel who targeted it." *Id.*; *accord id.* at 462 ("General Nessel's statements create a strong inference that the State's real target is the religious beliefs and confessions of [the plaintiff.]"). In other words, Defendant Nessel could not have it both ways. She could not openly malign religious free-exercise and then expect a court to turn a blind eye when her intentions regarding litigation were in focus. The same goes for assessing her statements and actions against fossil fuel companies.

26.     And the risk that Michigan will sue fossil fuel companies is real and imminent, not a mere speculative prospect. Not only has Defendant Nessel made her intentions known, she has hired outside firms as Special Assistant Attorneys General to develop and prosecute that litigation. *See supra* ¶¶ 14–21. Hence, the lawsuit "is likely to come to pass." *New Heights Farm I, LLC v. Great Am. Ins. Co.*, 119 F.4th 455, 460 (6th Cir. 2024).

27.     This imminent prospect of Michigan's litigation threatens a concrete injury to the sovereign interests of the United States. As alleged in greater detail below, the United States endures harm to its national energy policy so long as fossil fuel companies face a prospective chaotic patchwork of conflicting requirements from states and local governments. Regardless of the exact theories of liability that Michigan employs, its goals are clear—to extract large sums of money from fossil fuel companies for purportedly causing climate change impacts to Michigan. *See* Ex. 3 (explaining that "the parties who profited from hiding the consequences of fossil fuel use [should] bear the costs of climate change on Michigan").

28.     This imminent threat of litigation also undermines Congress's intent in the Clean Air Act for a unified federal approach to global air pollution. *See id.* (noting the prudential consideration of "hardship" to a party). And it undercuts the United States' foreign policy on greenhouse gas regulation and energy development. Thus, Michigan's indisputable threat to bring claims against fossil fuel companies is creating a concrete injury. *See Fischer v. Thomas*, 52 F.4th 303, 309 (6th Cir. 2022) (finding a claim ripe because an "ongoing investigation" that could lead to an enforcement action had a present impact on affected parties' planning their affairs).

29.     And the threats of enforcement via state-law litigation create an injury to the United States' interests—forcing fossil fuel companies to divert time, effort, and resources to

preparing for claims that are ultimately preempted. *See id.* This undermines the United States'
efforts to reduce state restrictions and burdens on energy production that are needlessly creating
a shortage of affordable energy. *See supra* ¶¶ 2–3.

30.     Hence, Michigan's ongoing efforts to impose state law liability through the
imminent threat of litigation create a tangible and present harm. Thus, this controversy is ripe,
and the United States is entitled to the relief it seeks.[2]

**The Clean Air Act Comprehensively Regulates Nationwide Air Pollution**

31.     The Clean Air Act, 42 U.S.C. § 7401 et seq., creates a comprehensive program for
regulating air pollution in the United States and "displaces" the ability of States to regulate
greenhouse gas emissions beyond their borders. *City of New York*, 993 F.3d at 96. The Act
improves the Nation's air quality by delegating authority to EPA to prescribe national standards
for air pollutants, which States then implement. *See, e.g.*, 42 U.S.C. § 7411.

32.     In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court concluded that
greenhouse gases, such as carbon dioxide and methane, are within the Clean Air Act's
unambiguous definition of "air pollutant," 42 U.S.C. § 7602(g). *Id*. at 528-529. Thus, the Clean
Air Act delegates to EPA authority to set nationwide standards for greenhouse gases. *See Am.
Electric Power Co., Inc. v. Connecticut* (*AEP*), 564 U.S. 410, 424-429 (2011).

33.     For in-state stationary sources, the Clean Air Act generally preserves the ability of
States to adopt and enforce air pollution control requirements and limitations on in-state sources,
so long as those are at least as stringent as the corresponding federal requirements. *See* 42 U.S.C.

---

[2] Should Michigan desire to end this lawsuit, the United States would accept a stipulation from
Michigan disavowing any intent to bring state-law claims against fossil fuel companies for
alleged harms from greenhouse-gas emissions and terminating its Climate Change litigation
efforts.

§ 7416. For out-of-state sources, however, the "Act gives states a much more limited role," even if the pollution from those sources causes harm within their borders. *City of New York*, 993 F.3d at 88. Affected States can: (1) comment on proposed EPA rules and certain permits and plans, *see id*. § 7607(d)(5), § 7475(a)(2), § 7410(a)(2)(C); 40 C.F.R. § 51.102(a); (2) seek judicial review if their concerns are not addressed, *see* 42 U.S.C. § 7607(b); and (3) petition EPA in certain instances, *see id*. § 7410(k)(5).

### The United States' Foreign Policy on Greenhouse Gas Regulation and Energy Development

34.    Greenhouse gas emissions "present[] a uniquely international problem of national concern." *City of New York*, 993 F.3d at 85. Regulating these emissions "implicates" not only "the conflicting rights of states" but also "our relations with foreign nations." *Id.* at 92.

35.    Consistent with the Constitution's allocation of supremacy in the field of foreign policy to the federal government, *see Hines v. Davidowitz*, 312 U.S. 52, 62 (1941), the federal government has demonstrated an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security when regulating greenhouse gas emissions and fossil fuels, *see City of New York*, 993 F.3d at 93 (recognizing responsibility of federal government in striking the right "balance" in promoting these goals). The federal government has been actively exercising its authority here and has been continually evaluating national interests as is its responsibility under the Constitution. It has "in fact . . . addressed" these interwoven issues on many occasions. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003).

36.    In 1987, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. Among its other goals, the Protection Act provided that the United States should "work

toward multilateral agreements" on the issue of greenhouse gas emissions. *Id*. § 1103(a)(4), 101 Stat. at 1408. It assigned to the President and EPA the responsibility for devising a "coordinated national policy on global climate change." *Id*. § 1103(b), 101 Stat. at 1408. And the Protection Act assigned to the President and the Secretary of State the responsibility for coordination of climate change policy "in the international arena." *Id*. § 1103(c), 101 Stat. at 1409.

37.    In 1992, President George H. W. Bush signed, and the Senate unanimously approved, the United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into force Mar. 21, 1994), which has as its "ultimate objective . . . stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." *Id*., Art. 2.

38.    Under the Framework Convention, "[a]ll Parties," including the United States, "shall . . . . (b) [f]ormulate, implement, publish and regularly update national and, where appropriate, regional programmes containing measures to mitigate climate change by addressing anthropogenic emissions by sources and removals by sinks of all greenhouse gases not controlled by the Montreal Protocol, and measures to facilitate adequate adaptation to climate change [and] (c) [p]romote and cooperate in the development, application and diffusion, including transfer, of technologies, practices and processes that control, reduce or prevent anthropogenic emissions of greenhouse gases not controlled by the Montreal Protocol in all relevant sectors . . . ." *Id*., Art. 4.1(b), (c).

39.    The Framework Convention does not set binding limits on greenhouse gas emissions for individual countries. It contains no enforcement mechanism. Instead, it includes general obligations addressing climate change and creates a framework for cooperation by its

parties. Among other things, it contemplates the possibility of its parties' negotiating "protocols" or other specific international agreements in pursuit of its objective.

40.    Since approving the Framework Convention, the United States has engaged in international efforts regarding climate change and greenhouse gas emissions, balancing foreign policy considerations and domestic energy needs. In particular, the United States is also a party to the Kigali Amendment to the Montreal Protocol. *See* Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, Oct. 15, 2016, S. Treaty Doc. No. 117-1, C.N.730.2017. The Amendment commits the United States and other signatory countries to phase down the production and consumption of hydrofluorocarbons, a greenhouse gas. The Senate ratified the Kigali Amendment in 2022, but only after Congress enacted the American Innovation and Manufacturing Act, 42 U.S.C. § 7675 in 2020, giving EPA authority under the Clean Air Act to reduce production and consumption of hydrofluorocarbons.

41.    By contrast, the United States is *not* a party to the Kyoto Protocol of 1997, which provided for greenhouse gas emission reduction targets on UNFCCC Annex I parties, including the United States. Though the United States signed the protocol, President Clinton never submitted it to the Senate for ratification. Instead, the Senate passed a unanimous resolution expressing disapproval of any protocol or other agreement that provides for disparate treatment of economically developing countries. S. Res. 98, 105th Cong. (1997).

42.    The United States is similarly not a party to the December 12, 2015 Paris Climate Accord (the Paris Agreement). Paris Agreement to the United Nations Framework Convention on Climate Change, Dec. 13, 2015, in Rep. of the Conference of the Parties on the Twenty-First Session, U.N. Doc. FCCC/CP/2015/10/Add.1, annex (2016). In September 2016, President Obama signed the Paris Agreement but did not submit it to the Senate for ratification. On March

12

28, 2017, President Trump described how the United States would seek to reconcile the Nation's environmental, economic, and strategic concerns. *See* Exec. Order 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2017). On November 4, 2019, the United States deposited a notification of withdrawal from the Paris Agreement. Although on February 19, 2021, President Biden announced that he rejoined this expensive and destructive protocol, on February 13, 2025, President Trump withdrew the United States from the Paris Agreement. *See* Executive Order 14162, *Putting America First in International Agreements* § 3(a). The President explained that "[i]t is the policy of my Administration to put the interests of the United States and the American people first in the development and negotiation of any international agreements with the potential to damage or stifle the American economy" and that such agreements "must not unduly or unfairly burden the United States." *Id*. § 2. In other words, the President would put the interests of the American people first in negotiating the terms of any future treaty to implement the Framework Convention.

43.    More recently, on April 2, 2025, President Trump invoked his authority under the International Emergency Economic Powers Act of 1977 to strengthen our Nation's international economic position by imposing reciprocal tariffs on U.S. trading partners. *See* Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*. The Executive Order specifically exempts "energy and energy products" from the tariffs. *Id.* § 3(b); *see also* Annex II.

## CLAIMS FOR RELIEF

### COUNT I
### Clean Air Act Preemption

44.    The United States incorporates by reference all allegations stated above.

45.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

46.    A state law is preempted under the Supremacy Clause when it intrudes into a field exclusively occupied by federal law (field preemption) or when it conflicts with federal law by standing as an obstacle to the accomplishment of Congress's objectives (conflict preemption). *See City of Milwaukee v. Illinois*, 451 U.S. 304, 316-17 (1981) (field preemption); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985) (conflict preemption).

47.    Any state law claims brought by Michigan predicated upon "the negative impacts of extraction and use of fossil fuels," Ex. 3, are preempted by the Clean Air Act, 42 U.S.C. §§ 7401 et seq., because they impermissibly regulate out-of-state greenhouse gas emissions and obstruct the Clean Air Act's comprehensive federal-state framework and EPA's regulatory discretion, *see, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987) ("The [Clean Water] Act pre-empts state law to the extent that the state law is applied to an out-of-state point source."); *Arizona*, 567 U.S. at 399-400 (discussing preemption).

48.    "The Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions." *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428).

14

49.     Congress delegated to EPA the authority to determine whether and how to regulate greenhouse gas emissions, thereby displacing federal common law claims and occupying the field of interstate air pollution regulation. *See Massachusetts*, 549 U.S. at 528-29 (holding that greenhouse gases are "air pollutants" under 42 U.S.C. § 7602(g)); *AEP*, 564 U.S. at 426 ("The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions . . . the delegation displaces federal common law."); *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (holding that the Federal Water Pollution Control Act's comprehensive regulatory program displaced federal common law of nuisance, as Congress occupied the field of water pollution regulation).

50.     The Clean Air Act's comprehensive framework, which includes specific provisions for regulating emissions from stationary and mobile sources (*see, e.g.*, 42 U.S.C. §§ 7410, 7411, 7521), preempts state attempts to regulate out-of-state greenhouse gas emissions. *See City of New York*, 993 F.3d at 90-100. Michigan's efforts to pursue state law claims holding fossil fuel businesses liable for global greenhouse gas emissions usurp this federal authority and impose a present injury on the United States. *See supra* ¶¶ 25–26. Michigan's threatening to make fossil fuel companies pay through state litigation for claimed effects of greenhouse gas emissions, *see supra* ¶¶ 14–21, most of which occur worldwide—outside Michigan's borders, is the type of state regulation of out-of-state interstate greenhouse gas emissions preempted by the Clean Air Act.

51.     Michigan's backdoor regulatory efforts conflict with the Clean Air Act's purposes and objectives by undermining its carefully calibrated cooperative federalism scheme and EPA's discretion in regulating greenhouse gas emissions.

52.    The Clean Air Act establishes a structured partnership between the federal government and States, allowing States to regulate in-state stationary sources under specific conditions, *see, e.g.*, 42 U.S.C. §§ 7401(a)(3), 7410(a)(2)(C), 7411(d), 7416, but limiting their role in regulating out-of-state or global emissions, see, e.g., 42 U.S.C. §§ 7410(a)(2)(C), 7410(k)(5), 7475(a)(2), 7607(b). And the Clean Air Act contains a citizen-suit savings clause. 42 U.S.C. § 7604(e). When read together, the Clean Air Act "plainly permit[s] [S]tates to create and enforce their own emissions standards applicable to in-state polluters." *City of New York*, 993 F.3d at 99. This role "no doubt holds true for both state legislation and common law claims under state law." *Id.* at 100 (citing *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690-91 (6th Cir. 2015)). "But that authorization is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* (citations omitted).

53.    Michigan's anticipated lawsuit "does not seek to take advantage of this slim reservoir of state common law." *City of New York*, 993 F.3d at 99. Rather, the State's actions threaten to interfere with the Clean Air Act's balance by effectively regulating out-of-state emissions. This extraterritorial regulation creates a patchwork of state-level penalties that undermines state authority over pollution sources within state borders and frustrates the Clean Air Act's goal of efficiency and predictability in the permit system. *See Ouellette*, 479 U.S. at 496; *see also AEP*, 564 U.S. at 426 (holding that the Clean Air Act's delegation to the EPA to regulate greenhouse gas emissions displaces federal common law, reflecting federal primacy). Such state encroachment on federal authority is preempted, as it obstructs the Clean Air Act's integrated approach to air pollution control. *See Ouellette*, 479 U.S. at 497; *see also City of New York*, 993 F.3d at 90-95.

16

54.     Moreover, Michigan's actions obstruct EPA's discretion to balance environmental, economic, and energy considerations in regulating greenhouse gases. The Clean Air Act grants EPA broad authority to promulgate regulations based on its expert judgment, including whether to impose emissions standards for stationary sources under 42 U.S.C. § 7411 and for mobile sources under 42 U.S.C. § 7521. By imposing retroactive liability for lawful conduct, Michigan would second-guess EPA's regulatory choices and imposes penalties that Congress did not authorize.

55.     Michigan's actions further undermine federal objectives by increasing energy costs and disrupting the national energy market, contrary to the Clean Air Act's integration with national energy policy. As noted in Executive Order 14156 (¶ 2), insufficient energy production due to restrictive state policies threatens national security and economic prosperity. By targeting major fossil fuel businesses, many of which operate on federal lands or supply federal agencies, Michigan's actions will raise costs for federal operations and consumers nationwide, obstructing the Clean Air Act's goal of balancing environmental protection with economic growth. *See* 42 U.S.C. § 7401(b)(1) (CAA's purpose includes protecting air quality "to promote the public health and welfare and the productive capacity of its population").

56.     If Michigan is permitted to continue pursuing these sorts of state law claims, other States could pursue similar claims, leading to a chaotic "patchwork" of regulations that undermine the national interest in readily available and affordable energy and the government's ability to effectively administer coherent national environmental policy and regulation of global pollution. *City of New York*, 993 F.3d at 86. Such fragmentation would frustrate Congress's intent for a unified federal approach to global air pollution. *See Hines*, 312 U.S. at 67 (state law preempted when it obstructs federal objectives).

17

57.     Thus, Michigan's state law claims are preempted by the Clean Air Act.

## COUNT II
### Unconstitutional Extraterritorial Regulation

58.     The United States incorporates by reference all allegations stated above.

59.     The Constitution's structure and provisions, including the Due Process Clause, as well as concepts of State sovereignty and federalism, prohibit a State from regulating transactions, and imposing liability for conduct, occurring outside its borders. Michigan's threats of state-law enforcement violate the Constitution by imposing extraterritorial liability for primarily out-of-state extraction and refining activities and out-of-state greenhouse gas emissions. Any such lawsuit is irreconcilable with the Constitution's commitment of such matters to the federal government and the relative rights and obligations of the federal government and the States under the Constitution.

60.     The United States has standing to assert this claim to protect its sovereign, proprietary, and parens patriae interests. Michigan's anticipated lawsuit, which would seek extraterritorial liability, interferes with the federal government's authority to regulate interstate and foreign commerce and greenhouse gas emissions, undermining national energy policy. The financial burdens of Michigan's anticipated lawsuit on fossil fuel businesses increase the United States' costs for purchasing fuels and threaten revenue from federal leasing. In its parens patriae capacity, the United States seeks to protect citizens nationwide from higher energy costs and economic disruption caused by Michigan's overreach, which individual litigants cannot fully address due to the nationwide impact of Michigan's state law claims.

61.     The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S.

18

Const. amend. XIV, § 1. The fossil fuel businesses targeted by Michigan's state law claims are persons under the Fourteenth Amendment.

62.    The Constitution's structure and principles of due process mandate that while States are sovereign within their borders, they cannot regulate conduct beyond their borders, such as by imposing liability for pollution from out-of-state sources. "The concept of Due Process constraints on a state legislature's ability to regulate subject matters and transactions beyond the state's boundaries, while perhaps infrequently litigated in those terms, is not new." *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236-37 (11th Cir. 2001) (discussing Due Process limits on legislative jurisdiction). Indeed, "[t]o resolve disputes about the reach of one State's power," the Supreme Court "has long consulted … the Constitution's structure and the principles of 'sovereignty and comity' it embraces," along with "the Due Process Clause." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (citation omitted).

63.    It is a well-established "due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries." *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (citing *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930)). "The sovereignty of each State, in turn, implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

64.    Indeed, the Due Process Clause embodies "more than a guarantee of immunity from inconvenient or distant litigation" but also imposes "territorial limitations on the power of the respective States." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco*

*Cnty.*, 582 U.S. 255, 263 (2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)) (discussing how the sovereignty of each state imposes limitations on sovereignty of other states).

65.     No single State can enact policies for the entire Nation, nor can a State "even impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 570-71 (1996). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572. "The states are not nations, either as between themselves or towards foreign nations," and "their sovereignty stops short of nationality." *New Hampshire v. Louisiana*, 108 U.S. 76, 90 (1883). And "interstate . . . pollution is a matter of federal, not state, law." *Ouellette*, 479 U.S. at 488.

66.     Michigan's efforts to regulate and impose liability for actions beyond its borders violate the Constitution's structure and principles of due process by seeking to impose economic sanctions on fossil fuel businesses for economic activities that occurred primarily in other States and around the world.

67.     Michigan improperly seeks to "impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)," *City of New York*, 993 F.3d at 93, including activities in other States and in foreign countries with no connection to Michigan. "Such a sprawling" scope "is simply beyond the limits of state law." *Id.* at 92.

68.     Even if an entity has some contacts with Michigan, such as in-state sales or operations, Michigan's effort to collect damages for out-of-state greenhouse gas emissions does not arise from or relate to those contacts, violating the requirement that a State's regulatory authority be limited to conduct with a substantial nexus to the State.

69.    Moreover, the global scope predicating any state law claims by Michigan inherently overreaches by seeking to regulate conduct far beyond Michigan's territorial jurisdiction, contravening the Due Process Clause's territorial limitations on state sovereignty.

70.    Thus, Michigan's efforts to impose state law liability on fossil fuel companies violate the Constitution's limits on extraterritorial action.

## COUNT III
### Violation of the Interstate Commerce Clause

71.    The United States incorporates by reference all allegations stated above.

72.    The Constitution gives Congress "Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

73.    State laws that discriminate against interstate commerce are unconstitutional, even in the absence of federal legislation regulating the activity in question. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

74.    Michigan's efforts to impose state law liability discriminate against interstate commerce facially, in practical effect, and in purpose by targeting commercial activity—fossil fuel extraction and refining—that occurs primarily if not exclusively in States other than Michigan, including Texas, New Mexico, Louisiana, West Virginia, Pennsylvania, Oklahoma, and North Dakota.

75.    Because Michigan's efforts to impose state law liability discriminate against interstate commerce, strict scrutiny applies, and its anticipated lawsuit can be pursued only if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988).

21

76.     Upon information and belief, Michigan has no legitimate local public interest in discriminating against interstate commerce.

77.     Moreover, even if Michigan's efforts to impose state law liability did not facially discriminate against interstate commerce and did not have non-discriminatory alternatives, they would still violate the Interstate Commerce Clause under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under *Pike*, a state law that regulates evenhandedly and has only incidental effects on interstate commerce is unconstitutional if the burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Id*.

78.     Michigan's efforts to impose state law liability also impose substantial burdens on interstate commerce. By targeting fossil fuel businesses for extraction and refining activities and greenhouse gas emissions occurring primarily in other States and foreign countries, Michigan is disrupting the national market for fossil fuels. Michigan's forcing fossil fuel companies to prepare for and defend against its claims will increase energy costs for consumers and businesses nationwide, as these costs are passed through the interstate energy market. Likewise, Michigan's request for damages would further increase energy costs. The potential for other States to adopt similar approaches to regulating fossil fuel companies creates a risk of regulatory fragmentation, undermining the uniform national energy market.

79.     Michigan's state law claims would impose a substantial and undue burden on interstate commerce that is clearly excessive in relation to any putative local benefits.

80.     Thus, Michigan's efforts to impose state law liability on fossil fuel companies violate the Interstate Commerce Clause.

## COUNT IV
## Violation of the Foreign Commerce Clause

81.    The United States incorporates by reference all allegations stated above.

82.    The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

83.    The Constitution gives Congress the "Power . . . [t]o regulate Commerce with foreign Nations . . . ."  U.S. Const. art. I, § 8, cl. 3.

84.    The Foreign Commerce Clause has a negative application. Thus, for example, State laws that impose taxes on foreign commerce "will not survive Commerce Clause scrutiny if the taxpayer demonstrates that the tax" implicates one of the four concerns identified in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). A State law imposing taxes is unconstitutional if it (1) applies to an activity lacking a substantial nexus to the State; (2) is not fairly apportioned; (3) discriminates against interstate commerce; *or* (4) is not fairly related to the services provided by the State. *See Barclays Bank PLC v. Franchise Tax Bd. Of California*, 512 U.S. 298, 310-11 (1994) (citing *Complete Auto*, 430 U.S. at 279). "In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Id.* at 311 (cleaned up). Thus, "[a] tax affecting *foreign* commerce therefore raises two concerns in addition to the four delineated in *Complete Auto*." *Id.* "The first is prompted by the enhanced risk of multiple taxation. The second relates to the Federal Government's capacity to speak with one voice when regulating commercial relations with foreign governments." *Id.* (cleaned up).

85.     Michigan's anticipated lawsuit is not a state tax. But the same limiting principles that apply to a State's power to impose taxes on foreign commerce also apply to a State's power to impose penalties, fines, and other civil liability on foreign commerce.

86.     Michigan's efforts to impose state law liability discriminate against foreign commerce facially, in practical effect, and in purpose by imposing penalties or fines that directly and substantially burden foreign commerce. Michigan would seek to impose liability on fossil fuel businesses for activities—extraction and refining of fossil fuels—that occurred "worldwide" in foreign countries. Michigan would seek to impose liability on these foreign activities even though they lack a substantial nexus to Michigan. Michigan also would discriminate against foreign commerce and imposes liability that is not fairly related to the services provided by the State. Michigan's anticipated lawsuit would enhance the risk of multiple States imposing overlapping liability on foreign commerce for the same activities. And Michigan's efforts harm the federal government's capacity to speak with one voice when conducting commercial relations with foreign governments on issues such as regulation of greenhouse gas emissions, trade policy, exports and imports of fossil fuels, and national security.

87.     The United States does not challenge Michigan's authority to regulate the local activities of international corporations, such as emissions from in-state facilities or taxes on in-state sales. Ordinary state regulations that incidentally affect foreign commerce without such extraterritorial scope or federal interference remain permissible under the Foreign Commerce Clause. But Michigan's efforts to impose state law liability do not fall within this permissible role for States. Rather, Michigan's attempt to expropriate funds from worldwide extraction and refining with minimal nexus to Michigan, imposes a disproportionate burden on foreign

commerce, and undermine the federal government's ability to maintain uniformity in regulating environmental, trade, and national security policy.

88.     Thus, Michigan's efforts to impose state law liability on fossil fuel companies violate the Foreign Commerce Clause.

## COUNT V
## Foreign Affairs Preemption

89.     The United States incorporates by reference all allegations stated above.

90.     The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

91.     Even aside from his military powers as the "Commander in Chief of the Army and Navy," U.S. Const. art. II, § 2, cl. 1, the Constitutions vests broad responsibility for the conduct of foreign affairs in the President of the United States.

92.     The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id*., art. II, § 2, cl. 2.

93.     The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id*.

94.     The President "receive[s] Ambassadors and other public Ministers." *Id*., art. II, § 3.

95.     The Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id*.

96.     In short, "the supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution." *Hines*, 312 U.S. at 62.

97.    The Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the States that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise has more than an incidental effect in conflict with express foreign policy. *See Garamendi*, 539 U.S. at 418-20.

98.    Michigan's efforts to impose state law liability fall outside the area of any traditional state interest. They instead regulate "a uniquely international problem" that is "not well-suited to the application of state law." *City of New York*, 993 F.3d at 85-86.

99.    By adopting the Framework Convention, the federal government undertook to formulate foreign policy with respect to the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."  Framework Convention, Art. 2.

100.    By attempting to impose liability based on greenhouse gas emissions purportedly attributable to worldwide fossil fuel extraction and refining, Michigan's anticipated lawsuit could undermine the ability of the United States to speak with one voice on a matter of pressing interest around the globe. Michigan's ongoing efforts to impose state law liability also will complicate the United States' relations with foreign countries concerning regulation of greenhouse gas emissions, trade policy, and exports and imports of fossil fuels. And Michigan's efforts to impose state law liability penalize extraction and refining activities in foreign countries despite the President's explicit judgment that energy imports should be exempt from the tariffs imposed under Executive Order 14257.

101.    Michigan's anticipated lawsuit interferes with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' participation in the

26

Framework Convention and announcement of its intention to withdraw from the Paris Agreement, and is therefore preempted.

102.    This claim does not challenge Michigan's authority to enact local regulations that incidentally affect international corporations, such as environmental standards for in-state operations. Instead, the United States seeks to prevent Michigan from pursuing its state law claims because its imposition of liability for worldwide greenhouse gas emissions directly intrudes on the federal government's exclusive authority over foreign affairs, including the United Nations Framework Convention on Climate Change and trade policy. This extraordinary extraterritorial reach and conflict with federal foreign policy distinguish Michigan's efforts from ordinary state regulations that do not undermine the United States' ability to speak with one voice in international relations.

103.    Simply put, Michigan's attempt "to recover damages for the harms caused by global greenhouse gas emissions may" not "proceed under [Michigan] law." *City of New York*, 993 F.3d at 91.

104.    Thus, Michigan's efforts to impose state law liability on fossil fuel companies are preempted by the foreign affairs doctrine.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.    Declare Michigan's state law claims unconstitutional under 28 U.S.C. § 2201;

B.    Permanently enjoin Defendants from taking actions to assert Michigan's state law claims;

C.    Award the United States its costs and disbursements in this action; and

D.    Award such other and further relief as the Court may deem just and proper.

                         Respectfully submitted,

                         ADAM R.F. GUSTAFSON
                         Acting Assistant Attorney General

                         ROBERT N. STANDER
                         Deputy Assistant Attorney General

                         s/ Justin D. Heminger
                         JUSTIN D. HEMINGER
                         Attorney
                         Environment and Natural Resources Division
                         U.S. Department of Justice
                         Post Office Box 7415
                         Washington, D.C. 20044
                         Telephone: (202) 514-5442
                         Facsimile: (202) 305-0506
                         Email: justin.heminger@usdoj.gov

# Exhibit 1



## **AG Attorney General**

# AG Nessel Requests Proposals from Attorneys to Pursue Litigation Against Fossil Fuel Industry for Climate Impact

May 09, 2024

**Media Contact:**

> ## **Danny Wimmer**
> Press Secretary
>
> agpress@michigan.gov

**LANSING** – Today, Michigan Attorney General Dana Nessel announced the Department will begin seeking proposals from attorneys and law firms to serve as Special Assistant Attorneys General to pursue litigation related to the climate change impacts caused by the fossil fuel industry on behalf of the State of Michigan.

"Our 'Pure Michigan' identity is under threat from the effects of climate change," Nessel said. "Warmer temperatures are shrinking ski seasons in the UP and disrupting the wonderful blooms of Holland's Tulip Time Festival. Severe weather events are on the rise. These impacts threaten not only our way of life but also our economy and pose long-term risks to Michigan's thriving agribusiness. The fossil fuel industry, despite knowing about these consequences, prioritized profits over people and the environment. Pursuing this litigation will allow us to recoup our costs and hold those responsible for jeopardizing Michigan's economic future and way of life accountable."

The Department is seeking proposals from attorneys and law firms with experience and interest in pursuing constitutional, statutory, tort and other applicable common law claims against the fossil fuel industry.

Proposals will be accepted through a blind-bid process, with contracts being awarded based on the best value to the State, considering qualifications, experience, abilities, capacity, and cost-effectiveness. The Attorney General will make the final decision based on recommendations from Department staff, ensuring an objective selection process that maintains bidder anonymity.

The Department will post a notice of award on its website after the selection has been made. Selected attorneys and law firms will be compensated on a contingency fee basis.

Attorneys and law firms interested in submitting proposals can visit the [Attorney General's website](#) for more information. The deadline to submit a proposal is June 5th.

### 

MI Newswire        Attorney General        Press Release

Environment        Climate Change

# Related News

## Department of Attorney General Assumes Prosecutorial Duties in Lake County

## Attorney General Nessel Blocks Returns and Sales of Machine Gun Conversion Devices in Michigan

After Suing the Trump Administration, Attorney General Nessel Secures Representations from the ATF and Country's Largest Purveyor of Forced Reset Triggers to Prevent Their Return and Sale in Michigan and 15 Other Jurisdictions

## Attorney General Nessel Files Lawsuit Against Construction Company for Alleged Consumer Violations

## Attorney General Nessel Joins Multistate Amicus Brief Defending School-Based Mental Health Services

## Attorney General Nessel Secures $720 Million National Settlement from Eight Opioid Drug Makers

## Attorney General Nessel Files Lawsuit to Stop Alleged Cloning Scheme Targeting Ferndale Businesses

## Wexford County Couple Charged with Multiple Counts of Felony Child Abuse

## Attorney General Nessel Files Amicus Brief Opposing Unlawful Termination of Environmental Justice Grant Program

## Attorney General Nessel Files Amicus Brief Supporting Case to Block ICE and CBP from Unlawful Practices in Los Angeles

## Federal Court Allows Attorney General Nessel's Antitrust Lawsuit Against Apple to Proceed



**AG Nessel Requests Proposals from Attorneys to Pursue Litigation Against Fossil Fuel Industry for Climate Impact**

Copyright State of Michigan

# Exhibit 2



## AG Attorney General

Climate Change



## Requests for Proposals for Climate Change Litigation

*The RFP process has concluded. The signed SAAG Contract and Fee Agreement are linked below.*

## Project Statement

This request for proposals (RFP) is to solicit proposals from attorneys and law firms to serve as Special Assistant Attorneys General (SAAGs) to pursue litigation related to the climate change impacts caused by the fossil fuel industry on behalf of the State of Michigan through the Department of Attorney General (DAG) (together, the State) on a contingency fee basis.

Email Your RFP Question(s) to the Solicitation Managers

This RFP is divided into the following parts:

**Proposal Instructions**

**Statement of Work (SOW)**

**Proposal Contents**

PDF   **SAAG Contract**

Timeline
Table

| Event | Time | Date |
| --- | --- | --- |
| RFP issue date | N/A | Thursday, May 9, 2024 |
| Deadline for bidders to submit questions about this RFP | 5:00 p.m. Eastern | Friday, May 17, 2024 |
| Anticipated date State will answer bidder questions | 5:00 p.m. Eastern | Friday, May 24, 2024 |
| *No questions regarding the Climate Change RFP process were received.* | | |
| Proposals due | 5:00 p.m. Eastern | Wednesday, June 5, 2024 |

| Anticipated timeframe oral presentations will be scheduled, if any | N/A | Monday, June 17-Friday, June 21, 2024 |
| *The anticipated timeframe for oral presentations has been pushed back to provide more time to review proposal materials.* | | |
| Anticipated date State will make decision | N/A | Prior to Friday, August 2, 2024 |

# Climate Change Litigation

## Signed SAAG Contract (PDF)

## Signed Fee Agreement (PDF)



**Climate Change**

Copyright State of Michigan

# Exhibit 3



# AG Attorney General
## Statement of Work (SOW)

## 1. Introduction.

This RFP is to solicit proposals from attorneys and law firms with experience and interest in pursuing constitutional, statutory, tort and other applicable common law claims against the fossil fuel industry for knowingly causing adverse impacts on climate, for deceiving the public about the climate changes that they knew their products would cause, and for the costs the State of Michigan has spent and will continue to spend to address and recover from the impacts of climate change. The Attorney General of the State of Michigan seeks to hold fossil fuel companies [and the industry's trade association] that profited from their actions for the damage they have caused and are causing. This RFP is for representation of the State of Michigan as duly-appointed Special Assistant Attorneys General on a contingency fee basis.

## 2. Background and Purpose.

The State of Michigan, its departments and agencies, and the State's businesses, residents, infrastructure, public and private lands, and natural resources suffer from the negative impacts of climate change. Climate change negatively impacts the State's economy by, among other things, decreasing tourism, harming agriculture, and depleting our tax base. The fossil fuel industry has known for decades that the use of fossil fuel products creates greenhouse gas pollution that warms the planet and leads to climate change. The impacts of climate change, in turn, have catastrophic and [potentially] irreversible consequences ranging from harmful algal blooms, uptick in invasive species and disease-bearing pests, atmospheric and ocean warming, melting polar ice caps and glaciers, more extreme and volatile weather, drought, and sea level rise. The fossil fuel industry was aware of the negative impacts of extraction and use of fossil fuels, but continued to knowingly engage in business practices and conduct that harmed the public's health, safety, and welfare and the environment. The fossil fuel industry also hid information and deceived the public and consumers, both in and outside of Michigan, about the role of their products in causing the global climate crisis.

The environment in and around Michigan, including the precious Great Lakes, is changing as a result of fossil fuel product use and emissions, leading to increased costs and losses to the State related to damaging severe weather, damage to State property and resources held and managed for the public, losses to property and business and associated loss of tax revenue, injury or destruction of State-owned and State-operated property and facilities, increased costs to maintain infrastructure, increased costs of providing public services, and increased health care and public health costs, among other costs.

The Department of Attorney General (DAG) has long enforced Michigan's environmental statutes and rules to protect the environment, natural resources, and public health and to require compliance with standards and limits on discharges into our environment. The regulatory framework alone may not fully account for the damage caused by fossil fuel product use and emissions, however, due to, among other things, the concealment of the known true hazards of the use of fossil fuels by the industry. Therefore, the State seeks to build on Michigan's longstanding history of environmental and resource protection to address the climate change crisis by retaining Special Assistant Attorneys General (SAAGs) to pursue constitutional, statutory, tort and other applicable common-law claims extending to the deception and other wrongful actions by the fossil fuel industry to require the parties who profited from hiding the consequences of fossil fuel use to bear the costs of climate change on Michigan, rather than the State, taxpayers, or residents of Michigan.

The work to be performed consists of assisting the DAG in gathering needed information, determining what claims will be brought, drafting the complaints (as appropriate), conducting affirmative and defensive discovery, taking and defending depositions, motion practice, and preparing for and conducting any trials that may proceed. Without limitation to the above, the DAG will direct the role of Local Counsel. The DAG, at all times, will direct the litigation in all respects, including but not limited to, whether and when to initiate litigation, against whom actions will be taken, the claims to be brought in said litigation, approval and rejection of all settlement offers, and the amount and type of damages and injunctive relief to be sought.

### 3. In Scope.

The scope of work includes providing all necessary personnel, labor, materials, services, equipment, supplies, time, travel, effort, skill, and supervision required to examine, investigate, recommend, and litigate the State's possible constitutional, statutory, tort and other applicable common law claims against fossil fuel industry defendants including but not limited to extractors, producers, transporters, refiners, manufacturers, distributors, promoters, marketers, and/or sellers of fossil fuel products.

SAAGs will be appointed to represent the State in litigation against fossil fuel industry defendants. SAAGs will develop and propose a litigation strategy to the Attorney General or her designees, including:

- Identifying viable claims and causes of action against fossil fuel industry defendants.

- Identifying possible defendants.

- Pursuing all claims and actions in connection with an approved litigation strategy against defendants approved by the Attorney General.

- Handling all appeals that may arise out of the litigation, subject to prior approval by the Attorney General.

Prior to providing any legal services on behalf of the State, an attorney must be appointed by the Attorney General as a SAAG. SAAGs must consult in advance with and advise the Attorney General's designated representatives regarding all substantive issues affecting the litigation, as set forth in more detail in the SAAG Contract (PDF).

## 4. Out of Scope.

The work does not include regulatory enforcement or claims under State or federal environmental laws not specifically and expressly agreed to by the Attorney General.



### Statement of Work (SOW)

Copyright State of Michigan

# Exhibit 4

# SAAG Contract

# State of Michigan
# Department of Attorney General

### Climate Change Litigation

DANA NESSEL, Attorney General of the State of Michigan (Attorney General), and the Department of Attorney General retain and appoint DiCello Levitt LLP, Sher Edling LLP, and Hausfeld LLP, to provide legal services through the appointment of the following firm attorneys as Special Assistant Attorneys General (SAAGs):

| DiCello Levitt | Sher Edling |
|---|---|
| Adam Levitt | Matt Edling |
| Anna Claire Skinner | Vic Sher |
| Daniel Rock Flynn | Stephanie Biehl |
| | Katie Jones |
| | Ashley Campbell |

| Hausfeld |
|---|
| Katie R. Beran |
| Michael D. Hausfeld |
| Scott Gilmore |
| Kartik S. Madiraju |
| Emma Blake |
| James Gotz |
| Richard S. Lewis |
| Samantha Derksen |
| Erika A. Inwald |

The legal services provided to the State of Michigan will be pursuant to the following terms and conditions in this Contract:

## 1.    PARTIES/PURPOSE

1.1     Parties.  The parties to this Contract are the Department of Attorney General (Department) and DiCello Levitt, Sher Edling, and Hausfeld.  No other attorney may engage in the practice of law on behalf of the State of Michigan under this Contract without the Department's prior approval, a Contract amendment, and a SAAG appointment from the Attorney General, except that:  (a) the SAAGs may work with other attorneys and support staff at each of their respective firms under the SAAGs' respective supervision and control, and (b) the SAAGs may hire contract lawyers to perform document review tasks in conjunction with this litigation.  The

1

SAAGs agree to periodically keep the Department apprised of all personnel working on the matters described in this Contract.

1.2    Purpose.  The Department and DiCello Levitt, Sher Edling, and Hausfeld agree that the SAAGs will provide legal services relative to Climate Change litigation.  The SAAGs are to work only on Climate Change litigation and all case resolutions are to be approved in advance by the Department.

1.3    Work Product.  The SAAGs understand that all work product is subject to review by the Department.  The Department reserves the right to deny payment for any work product deemed unacceptable.  Delivery of such a deficient work product may also result in Contract termination under paragraph 9 of this Contract.

## 2.    TERM OF CONTRACT

The initial term of this Contract is September 26, 2024 through September 30, 2027.  This Contract may be extended at the option of the Department upon thirty (30) calendar days' written notice.

## 3.    COMPENSATION AND COST REIMBURSEMENT

3.1    Compensation and the repayment of costs and disbursements shall be contingent upon a successful recovery of funds being obtained from Defendant(s) in the litigation pursued under the terms of this Contract (whether through settlement or final non-appealable judgment).

3.2    If no recovery is made, the State owes nothing for costs incurred by the SAAGs and is not obligated to reimburse the SAAGs for any costs.

3.3    If a recovery is obtained, the costs incurred by the SAAGs will be deducted prior to the calculation of the fee set forth in the Fee Agreement.  The SAAGs will be required to submit a quarterly statement to the Department setting forth in detail any potentially reimbursable costs incurred with respect to this appointment, together with a running total of costs accumulated since the execution of the Fee Agreement.

## 4.    REPRESENTATIONS

4.1    Qualifications.  The SAAGs, by signing this Contract, attest that they are qualified to perform the services specified in this Contract and agree to faithfully and diligently perform the services consistent with the standard of legal practice in the community.

4.2    Conflict of Interest.  Prior to entering into this Contract, the SAAGs and the SAAGs' law firms must identify and disclose to the Department any matter in which the SAAGs or any member of the SAAGs' law firm is involved in which is adverse to the State of Michigan.  The SAAGs represent that they have conducted a conflict check prior to entering into this Contract and disclosed any actual or potential conflicts with the proposed legal services.  The SAAGs and DiCello Levitt, Sher Edling, and Hausfeld agree to not undertake representation of a client if the representation of that client will be adverse to the State of Michigan, unless the SAAGs obtain prior written approval to do so from the Department.

With respect to potential conflicts of interest, other lawyers in the SAAGs' firm must be advised of the SAAGs' representation of the Department, and that the firm has agreed not to accept, without prior written approval from the Department, any employment from other interests adverse to the State of Michigan.  DiCello Levitt, Sher Edling, and Hausfeld must carefully monitor any significant change in the assignments or clients of the firms in order to avoid any situation which might affect its ability to effectively render legal services to the Department.

4.3    Services to be Confidential.  The SAAGs must keep confidential all services and information, including records, reports, and estimates.  The SAAGs must not divulge any information to any person other than to authorized representatives of the Department, except as required by testimony under oath in judicial proceedings, or as otherwise required by law.  The SAAGs must take all necessary steps to ensure that no member of the firms divulge any information concerning these services.  This includes, but is not limited, to information maintained on the SAAGs' computer and networked systems.

All files and documents containing confidential information must be filed in separate files maintained in the offices of DiCello Levitt, Sher Edling, and Hausfeld with access restricted to each SAAG and needed clerical personnel.  All documents prepared on the DiCello Levitt, Sher Edling, and Hausfeld computer systems must be maintained in a separate library with access permitted only to each SAAG and needed clerical personnel.

4.4    Assignments and Subcontracting.  The SAAGs must not assign or subcontract any of the work or services to be performed under this Contract, including work assigned to other members or employees of the SAAGs' firms, without the prior written approval of the Department.  Any member or employee of the SAAG firms who received prior approval from the Department to perform services under this Contract is bound by the terms and conditions of this Contract.

4.5    Facilities and Personnel.  The SAAGs have and will continue to have proper facilities and personnel to perform the services and work agreed to be performed.

3

4.6     Advertisement.  The SAAGs, during the term of appointment and thereafter, must not advertise their position as SAAGs to the public.  The SAAG designation may be listed on the SAAG's resume or other professional biographical summary, including resumes or summaries that are furnished to professional societies, associations, or organizations.  Any such designation by the SAAG must first be submitted to and approved by the Department.

4.7     Media Contacts.  The SAAGs may not engage in any on or off the record communication (written or spoken) with any member of the media without advance approval and appropriate vetting by the Director of the Office of Public Information and Education of the Department of Attorney General.

4.8     Records.  As set forth in Paragraph 3.3 of this Contract, the SAAGs must submit a quarterly statement to the designated representative(s) of the Attorney General, setting forth in detail any potentially reimbursable costs incurred with respect to this appointment, together with a running total of costs accumulated since the execution of the Fee Agreement.  These invoices shall be considered confidential and not be subject to discovery in the litigation brought under the Scope of Work.  The records must be kept in accordance with generally accepted accounting practices and sound business practices.  The Department or its designees, reserve the right to inspect all records of the SAAGs related to this Contract.

4.9     Non-Discrimination.  The SAAGs, in the performance of this Contract, and DiCello Levitt, Sher Edling, and Hausfeld, agree not to discriminate against any employee or applicant for employment, with respect to their hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment, because of race, color, religion, national origin, ancestry, age, sex, height, weight, marital status, physical or mental disability unrelated to the individual's ability to perform the duties of the particular job or position.  This covenant is required by the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, and the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*, and any breach of the Act may be regarded as a material breach of the Contract.  The SAAGs agree to comply with the provisions of the Federal Civil Rights Act of 1964, 42 USC §2000d, in performing the services under this Contract.

4.10    Unfair Labor Practices.  The State will not award a contract or subcontract to any employer, or any subcontractor, manufacturer, or supplier of the employer, whose name appears in the current register compiled pursuant to 1980 PA 278, MCL 423.321 *et seq.*  The State may void this Contract if after the award of the Contract, the name of the SAAGs or their law firms appear in the register.

4.11    Compliance.  The SAAGs' activities under this Contract are subject to applicable State and Federal laws and to the Rules of Professional Conduct

4

applicable to members of the Michigan Bar Association.  In accordance with MCL 18.1470, DTMB or its designee may audit DiCello Levitt, Sher Edling, and Hausfeld to verify compliance with this Contract.

    4.12    Independent Contractor.  The relationship of the SAAGs to the Department of Attorney General in this Contract is that of an independent contractor.  No liability or benefits, such as workers compensation rights or liabilities, insurance rights or liabilities, or any other provisions or liabilities, arising out of or related to a contract for hire or employer/employee relationship, must arise, accrue or be implied to either party or either party's agent, subcontractor or employee as a result of the performance of this Contract.  The SAAGs and DiCello Levitt, Sher Edling, and Hausfeld will be solely and entirely responsible for their acts and the acts of DiCello Levitt, Sher Edling, and Hausfeld's agents and employees during the performance of this Contract.  Notwithstanding the above, the relationship is subject to the requirements of the attorney-client privilege.

## 5.    MANAGEMENT OF CASES

    5.1    Notifications.  The SAAGs must direct all notices, correspondence, inquiries, billing statements, pleadings, and documents mentioned in this Contract to the attention of the Department's Environment, Natural Resources, and Agriculture (ENRA) Division.  The Division Chief of the ENRA Division is the Contract Manager, unless notice of another designation is received from the Attorney General.  The Division Chief may designate an Assistant Attorney General in the Division to oversee the day-to-day administration of the Contract.

For the Department:

> Polly Synk, Division Chief
> Michigan Department of Attorney General
> ENRA Division
> P.O. Box 30755
> Lansing, MI 48909
> 517-335-7664
> SynkP@michigan.gov

For the SAAGs:

> Matthew K. Edling
> Sher Edling LLP
> 100 Montgomery St., Ste. 1410
> San Francisco, CA 94104
> 628-231-2520
> matt@sheredling.com

5

' Daniel R. Flynn
DiCello Levitt LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
312-214-7900
dflynn@dicellolevitt.com

Katie R. Beran
Hausfeld LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
267-702-2315
kberan@hausfeld.com

5.2    The SAAGs must promptly inform the Contract Manager of the
following developments as soon as they become known:

      A.    Favorable actions or events that enable meeting time schedules
and/or goals sooner than anticipated.

      B.    Delays or adverse conditions that materially prevent, or may
materially prevent, the meeting of the objectives of the services provided.  A
statement of any remedial action taken or contemplated by any SAAG must
accompany this disclosure.

For every case accepted, the SAAGs must:

      A.    Promptly undertake all efforts, including legal proceedings, as
directed by the ENRA Division, and must prosecute any case to its conclusion
unless directed to the contrary by the ENRA Division.

      B.    Provide copies of all pleadings filed in any court by any SAAG,
or by the opposing party, to the ENRA Division.

5.3    Motions.  Before any dispositive motion is filed, the supporting brief
must be submitted to the ENRA Division for review and approval for filing with the
court.

5.4    Investigative Support.  All claims will be vigorously pursued and
prepared for filing.  If authorized by the Contract Manager, use of investigative
subpoenas must be thorough and aggressive.  The ENRA Division may request
investigative subpoenas in addition to what the SAAGs have filed.

5.5    Discovery Requests. The SAAGs must consult with Contract Manager and assist in the preparation of answers to requests for discovery. The SAAGs must indicate those requests to which they intend to object.

5.6    Witness and Exhibit Lists. At least ten (10) calendar days before the day a witness list or an exhibit list is due, the Contract Manager must receive a preliminary witness list or exhibit list for review and recommendation of additional names of witnesses or additional exhibits.

5.7    Mediation. Fifteen (15) calendar days before any mediation, the mediation summary must be submitted to the Contract Manager for review and recommendation. Immediately following mediation, the SAAGs must submit a status memorandum indicating the amount of the mediation and a recommendation to accept or reject the mediation.

5.8    Trial Dates. The SAAGs must advise the Contract Manager immediately upon receipt of a trial date.

5.9    Settlements. All settlements are subject to approval by the Department. The SAAGs must immediately communicate any plea/settlement proposal received along with a recommendation to accept, reject, or offer a counter-proposal to any offer received to the Department's Contract Manager. "Settlement" includes, but is not limited to, the voluntary remand of a case to the trial court or by way of stipulation or motion.

5.10    Experts. The SAAGs must provide advance notice to the Contract Manager prior to the selection of experts or consultants, and the Attorney General shall have the right to reject proposed experts or consultants. The SAAGs shall cooperate with the Department and make all records and documents relevant to the tasks as described in the Scope of Work available to the Department through the Contract manager or his or her designee in a timely fashion.

5.11    Money. The SAAGs must only accept payment by an opposing party under the following terms:

A.    The SAAGs must immediately inform the Contract Manager upon receipt of any funds by the SAAGs as payment on a case, whether pursuant to court order, settlement agreement, or other terms. Following the deduction of reimbursable costs, calculation of the fee under the Fee Agreement, and approval of the calculated fee by the Department, the SAAGs shall deduct the Department-approved eligible costs, the Department-approved fee, and shall make payment of the remainder of the recovery to the State of Michigan as follows:

7

      i.     payment must be made by check, certified check, cashier's check, or money order;

      ii.     payable to the "State of Michigan" or as otherwise specified by the Contract Manager;

      iii.     include the tax identification number/social security number of the payer; and

      iv.     include the account to which the remittance is to be applied.

5.12    File Closing.  The SAAGs must advise the Contract Manager, in writing, of the reason for closing a file (e.g., whereabouts unknown, no assets, bankruptcy, payment in full, or settlement).

## 6.   INDEMNIFICATION

The SAAGs agree to hold harmless the State of Michigan, its elected officials, officers, agencies, boards, and employees against and from any and all liabilities, damages, penalties, claims, costs, charges, and expenses (including, without limitation, fees and expenses of attorneys, expert witnesses and other consultants) which may be imposed upon, incurred by, or asserted against the State of Michigan for either of the following reasons:

    A.    Any malpractice, negligent or tortious act or omission attributable, in whole or in part, to the SAAGs or any of its employees, consultants, subcontractors, assigns, agents, or any entities associated, affiliated, or subsidiary to the SAAGs now existing, or later created, their agents and employees for whose acts any of them might be liable.

    B.    The SAAGs' failure to perform their obligation either expressed or implied by this Contract.

## 7.   INSURANCE

7.1    Errors and Omissions.  The SAAGs or DiCello Levitt, Sher Edling, and Hausfeld must maintain professional liability insurance sufficient in amount to provide coverage for any errors or omissions arising out of the performance of any of the professional services rendered pursuant to this Contract.

7.2    Certificates of Insurance.  Certificates evidencing the purchase of insurance must be furnished to the Department's ENRA Division, upon request.  All certificates are to be prepared and submitted by the insurance provider and must

contain a provision indicating that the coverage(s) afforded under the policies will not be cancelled, materially changed, or not renewed without thirty (30) calendar days prior written notice, except for ten (10) calendar days for non-payment of premium, and any such notice of cancellation, material change, or non-renewal must be promptly forwarded to the Department upon receipt.

7.3    Additional Insurance.  If, during the term of this Contract changed conditions should, in the judgment of the Department, render inadequate the insurance limits the SAAGs will furnish, on demand, proof of additional coverage as may be required.  All insurance required under this Contract must be acquired at the expense of the SAAGs or DiCello Levitt, Sher Edling, and Hausfeld, under valid and enforceable policies, issued by insurers of recognized responsibility.  The Department reserves the right to reject as unacceptable any insurer.

## 8.    APPEALS

The SAAGs agree that no appeal of any order(s) of the Michigan Court of Claims, any Michigan Circuit Court, the Michigan Court of Appeals, or any United States District Court will be taken to the Michigan Court of Appeals, the Michigan Supreme Court, or any United States Circuit Court of Appeals, without prior written approval of the Michigan Solicitor General, Department of Attorney General.  Further, the SAAGs agree that no petition for certiorari will be filed in the United States Supreme Court without prior written permission of the Michigan Solicitor General, Department of Attorney General.

## 9.    TERMINATION OF CONTRACT AND APPOINTMENT

9.1    SAAG Termination.  The SAAGs may terminate this Contract upon sixty (60) calendar days' prior written notice (Notice of Termination).  Upon delivery of such notice, the SAAGs must continue all work and services until otherwise directed by the ENRA Division.  The SAAGs will be paid only as set forth in the contingency fee arrangement specified under the Fee Agreement.

9.2    Attorney General Termination.  The Department may terminate this Contract and SAAG appointments, at any time and without cause, by issuing a Notice of Termination to the SAAGs.  Should the Department terminate this Contract and the SAAGs' appointment, the SAAGs shall be held to have not waived any rights or legal remedies and may seek *quantum meruit* compensation (whether hourly or in the form of a percentage of any recovery ultimately obtained in the litigation), as well as necessary litigation costs incurred under the Contract, either directly from the Department, or through litigation in the Michigan Court of Claims.

9.3    Termination Process and Work Product.  Upon receipt of a Notice of Termination, and except as otherwise directed by the Attorney General or her designee, the SAAGs must:

      A.    stop work under the Contract on the date and to the extent specified in the Notice of Termination;

      B.    incur no costs beyond the date specified by the Department;

      C.    on the date the termination is effective, submit to the Contract Manager all records, reports, documents, and pleadings as the Department specifies and carry out such directives as the Department may issue concerning the safeguarding and disposition of files and property; and

      D.    submit within thirty (30) calendar days a closing memorandum and final billing.

Upon termination of this Contract, all finished or unfinished original (or copies when originals are unavailable) documents, briefs, files, notes, or other materials (the "Work Product") prepared by the SAAGs under this Contract, must become the exclusive property of the Department, free from any claims on the part of the SAAG except as herein specifically provided.  The Work Product must promptly be delivered to the ENRA Division.  The SAAGs acknowledge that any intentional failure or delay on its part to deliver the Work Product to the Department will cause irreparable injury to the State of Michigan not adequately compensable in damages and for which the State of Michigan has no adequate remedy at law.  The SAAGs accordingly agree that the Department may, in such event, seek injunctive relief in a court of competent jurisdiction.  The Department must have full and unrestricted use of the Work Product for the purpose of completing the services.  In addition, each party will assist the other party in the orderly termination of the Contract.

The rights and remedies of either party provided by the Contract are in addition to any other rights and remedies provided by law or equity.

## 10.    GENERAL PROVISIONS

10.1    Governing Law and Jurisdiction.  This Contract is subject to and will be constructed according to the laws of the State of Michigan, and no action must be commenced against the Department or the Attorney General, his designee, agents or employees for any matter whatsoever arising out of the Contract, in any courts other than the Michigan Court of Claims.

10.2    No Waiver.  A party's failure to insist on the strict performance of this Contract does not constitute waiver of any breach of the Contract.

10.3    Additional SAAGs.  It is understood that during the term of this Contract, the Department may contract with other SAAGs providing the same or similar services.  The Department shall consult with the SAAGs prior to retaining any additional SAAGs under this Paragraph 10.3.

10.4    Other Debts.  The SAAGs agree that they are not, and will not become, in arrears on any contract, debt, or other obligation to the State of Michigan, including taxes.

10.5    Invalidity.  If any provision of this Contract or its application to any persons or circumstances to any extent is judicially determined to be invalid or unenforceable, the remainder of this Contract will not be affected, and each provision of the Contract will be valid and enforceable to the fullest extent permitted by law.

10.6    Headings.  Contract section headings are for convenience only and must not be used to interpret the scope or intent of this Contract.

10.7    Entire Agreement.  This Contract represents the entire agreement between the parties and supersedes all proposals or other prior agreements, oral or written, and all other communications between the parties.

10.8    Amendment.  No Contract amendment will be effective and binding upon the parties unless it expressly makes reference to this Contract, is in writing, and is signed by duly authorized representatives of all parties and all the requisite State approvals are obtained.

10.9    Issuing Office.  This Contract is issued by the Department, and is the only state office authorized to change the terms and conditions of this Contract.

10.10  Counterparts.  This Contract may be signed in counterparts, each of which has the force of an original, and all of which constitute one document.

[This space left blank intentionally.]

11

Dated:  September 5, 2024

Adam Levitt

Dated:  September 5, 2024

Anna Claire Skinner

Dated:  September 5, 2024

Daniel Rock Flynn

Dated:  September 5, 2024

Matthew K. Edling

Dated:  September 5, 2024

Vic Sher

Dated:  September 5, 2024

Stephanie Biehl

Dated:  September 5, 2024

Katie Jones

Dated:  September 5, 2024

Ashley Campbell

[This space left blank intentionally.]

Dated: _____September 5, 2024_____        _Katie R. Beran_
                                               _____
                                               Katie R. Beran

Dated: **September 6, 2024**                   _____
                                               James Gotz

Dated: **September 6, 2024**                   _____
                                               Michael D. Hausfeld

Dated: **September 6, 2024**                   _Richard Lewis_
                                               Richard Lewis (Sep 6, 2024 13:14 EDT)
                                               _____
                                               Richard S. Lewis

Dated: **September 6, 2024**                   _____
                                               Scott Gilmore

Dated: **September 6, 2024**                   _____
                                               Samantha Derksen

Dated: **September 6, 2024**                   _____
                                               Kartik S. Madiraju

Dated: **Sep 6, 2024**                         _Erika A. Inwald_
                                               Erika A. Inwald (Sep 6, 2024 13:44 EDT)
                                               _____
                                               Erika A. Inwald

Dated: **Sep 6, 2024**                         _____
                                               Emma Blake


[This space left blank intentionally.]


13

Dated:  September 26, 2024

Dana Nessel, Attorney General
or her Designee
Michigan Department of Attorney
General

# Exhibit 5

# FEE AGREEMENT

## State of Michigan
## Department of Attorney General

### Climate Change Litigation

1.      This is a contingent fee Contract.  Applicant law firms DiCello Levitt LLP, Sher Edling LLP, and Hausfeld LLP have been selected to enter into a SAAG Contract to provide legal services through the appointment of specified individuals as Special Assistant Attorneys General (SAAGs).  DiCello Levitt, Sher Edling, and Hausfeld shall receive no compensation from the State of Michigan for any services rendered unless the State of Michigan recovers civil penalties, compensatory or punitive damages, and/or attorneys' fees in connection with the litigation described in the Contract to which this Fee Agreement is attached.  If the State obtains such a recovery, DiCello Levitt, Sher Edling, and Hausfeld will be compensated for its services as follows:

        a.      Those costs necessary for conducting the litigation described in the SAAG Contract shall initially be advanced by DiCello Levitt, Sher Edling, and Hausfeld and shall be deducted from the litigation's gross or total recovery, if any, before any further distribution is made;

        b.      Of the monies remaining from any recovery after deducting costs, DiCello Levitt, Sher Edling, and Hausfeld shall receive a contingent fee according to the following graduated scale:

|  | Stage of Litigation at which Recovery is Obtained | |
| --- | --- | --- |
| **Amount of Recoveries (after deducting Costs and Expenses)** | **Before discovery** | **After Commencement of Discovery** |
| $0 to $150,000,000.00; plus | 10% | 16.67% |
| Any Portions of Sums Recovered Exceeding $150,000,000.00 | 2.5% | 7.5% |

        c.      In the event that DiCello Levitt, Sher Edling, and Hausfeld enter into a contingency fee contract with any other State for the purpose of pursuing Climate Change Litigation, the State of Michigan reserves the right to amend subsection 1(b) of the Fee Agreement to include the contingency fee formula or scale from that contract with another State for Climate Change Litigation.

1

2.      All settlement or judgment proceeds shall be paid by or on behalf of the defendant(s) to the SAAGs in accordance with the provisions of Par. 5.11 of the Contract to which this Fee Agreement is attached.

3.      DiCello Levitt, Sher Edling, and Hausfeld shall advance all necessary costs necessary for conducting the litigation, including, but not limited to, expert witness fees and costs, deposition costs, and costs of document review and production.  DiCello Levitt, Sher Edling, and Hausfeld's agreement to advance all litigation costs, as well as its agreement to defer fees while any and all litigation (including appeals and enforcement actions) is pending, has been taken into consideration in establishing the fee schedule above.

4.      DiCello Levitt, Sher Edling, and Hausfeld shall be reimbursed for reasonable costs solely from the recovery of funds obtained from the defendant(s) in the litigation under the terms of the SAAG Contract, as approved by the Attorney General.  Reimbursement for reasonable and necessary meals, lodging, and travel expenses shall be in accordance with the State of Michigan travel and other expense requirements, which can be found at http://www.michigan.gov/dmb/0,1607,7-150-9141_13132---,00.html.  Expenses exceeding State rates will not be reimbursed. Proper documentation by receipts or otherwise shall be submitted, with all invoices and all documentation to be retained by DiCello Levitt, Sher Edling, and Hausfeld for at least one full year following this Agreement's termination.  All costs must be itemized and no reimbursement may be applied for or requested for "miscellaneous" listings.  The Attorney General in her sole discretion may decline to reimburse DiCello Levitt, Sher Edling, and Hausfeld for improperly documented, unnecessary, or unreasonable costs.

5.      The State will not pay for attorney or paralegal time spent performing clerical tasks, such as filing, indexing, or page numbering.

[This space left blank intentionally.]

Dated:    September 5, 2024    _____
Adam Levitt

Dated:    September 5, 2024    _____
Anna Claire Skinner

Dated:    September 5, 2024    _____
Daniel Rock Flynn

Dated:    September 5, 2024    _____
Matt Edling

Dated:    September 5, 2024    _____
Vic Sher

Dated:    September 5, 2024    _____
Stephanie Biehl

Dated:    September 5, 2024    _____
Katie Jones

Dated:    September 5, 2024    _____
Ashley Campbell

[This space left blank intentionally.]

3

Dated: ___September 5, 2024___        *Katie R. Beran*
                                      _____
                                      Katie R. Beran

Dated: **Sep 6, 2024**                _____
                                      James Gotz

Dated: **Sep 6, 2024**                _____
                                      Michael D. Hausfeld

Dated: **Sep 6, 2024**                *Richard Lewis*
                                      Richard Lewis (Sep 6, 2024 13:13 EDT)
                                      _____
                                      Richard S. Lewis

Dated: **Sep 6, 2024**                _____
                                      Scott Gilmore

Dated: **Sep 6, 2024**                _____
                                      Samantha Derksen

Dated: **Sep 6, 2024**                _____
                                      Kartik S. Madiraju

Dated: **Sep 6, 2024**                *Erika A. Inwald*
                                      Erika A. Inwald (Sep 6, 2024 13:44 EDT)
                                      _____
                                      Erika A. Inwald

Dated: **Sep 6, 2024**                _____
                                      Emma Blake


[This space left blank intentionally.]


4

Dated:  September 26, 2024

Dana Nessel, Attorney General
or her Designee
Michigan Department of Attorney
General

# Exhibit 6



## AG Attorney General

---

# AG Nessel Moves to Dismiss DOJ Lawsuit Aimed at Blocking Potential Climate Action Against Fossil Fuel Industry

June 20, 2025

**Media Contact:**

**Danny Wimmer**

Press Secretary

agpress@michigan.gov

**LANSING** – Michigan Attorney General Dana Nessel today filed a Motion to Dismiss a lawsuit filed by the United States Department of Justice (DOJ) on April 30, 2025. The DOJ's lawsuit seeks to prohibit the State of Michigan from filing any lawsuit against the fossil fuel industry related to climate impacts.

"The DOJ's baseless lawsuit is a blatant attempt to intimidate my office and deter us from holding Big Oil accountable," Nessel said. "Any lawsuit we file against the fossil fuel industry is still in the development stage and entirely unknown to the administration, as their own filing admits, making this move not just premature but deficient. We will not be bullied, and I remain undeterred in my intent to pursue justice on behalf of Michigan residents."

The Attorney General's motion and brief (PDF) filed in the United States District Court for the Western District of Michigan argues that the DOJ complaint is speculative and premature and should be dismissed for a lack of jurisdiction. Since no lawsuit has been filed by the State, DOJ's complaint, Attorney General Nessel argues, is based on predictions and guesswork about what a hypothetical future case may or may not include.

###

MI Newswire        Attorney General        Press Release

## Related News

### Department of Attorney General Assumes Prosecutorial Duties in Lake County

### Attorney General Nessel Blocks Returns and Sales of Machine Gun Conversion Devices in Michigan

After Suing the Trump Administration, Attorney General Nessel Secures Representations from the ATF and Country's Largest Purveyor of Forced Reset Triggers to Prevent Their Return and Sale in Michigan and 15 Other Jurisdictions

### Attorney General Nessel Files Lawsuit Against Construction Company for Alleged Consumer Violations

### Attorney General Nessel Joins Multistate Amicus Brief Defending School-Based Mental Health Services

### Attorney General Nessel Secures $720 Million National Settlement from Eight Opioid Drug Makers

### Attorney General Nessel Files Lawsuit to Stop Alleged Cloning Scheme Targeting Ferndale Businesses

### Wexford County Couple Charged with Multiple Counts of Felony Child Abuse

**Attorney General Nessel Files Amicus Brief Opposing Unlawful Termination of Environmental Justice Grant Program**

**Attorney General Nessel Files Amicus Brief Supporting Case to Block ICE and CBP from Unlawful Practices in Los Angeles**

**Federal Court Allows Attorney General Nessel's Antitrust Lawsuit Against Apple to Proceed**



**AG Nessel Moves to Dismiss DOJ Lawsuit Aimed at Blocking Potential Climate Action Against Fossil Fuel Industry**

Copyright State of Michigan